# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

Thomas K. Kahn
Clerk

For rules and forms visit
www.ca11.uscourts.gov

September 05, 2008

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI  FL  33128-1813

**Appeal Number: 05-16964-JJ**
Case Style: Jerry Greenberg v. National Geographic Society
District Court Number:  97-03924 CV-AMS

REC'D by _HSD_ D.C.
NOV 2 5 2008
STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:

Bill of Costs
    Original Exhibits, consisting of: two folders, two envelopes, one box
    Original record on appeal or review, consisting of: seventeen volumes

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

✓ (1) Box of Exhibits Containing Magazine on CD-Rom
✓ (2) Large Envelopes Containing the attachments for Dkt's 46 & 47

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 05-16964

District Court Docket No.
97-03924-CV-AMS

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jun 30, 2008

THOMAS K. KAHN
CLERK

JERRY GREENBERG,
individually,

                    Plaintiff-Appellee,

IDAZ GREENBEREG,
individually,

                    Plaintiff,

versus

NATIONAL GEOGRAPHIC SOCIETY,
a District of Columbia corporation,
NATIONAL GEOGRAPHIC ENTERPRISES, INC.,
a corporation,
MINDSCAPE, INC.,
a California corporation,

                    Defendants-Appellants.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:_____
Deputy Clerk
Atlanta, Georgia

--------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
--------------------------------------------------------------

J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
SEP 0 5 2008
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:      June 30, 2008
For the Court:  Thomas K. Kahn, Clerk
        By:   Jackson, Jarvis

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2008
THOMAS K. KAHN
CLERK

No. 05-16964

D.C. Docket No. 97-03924-CV-AMS

JERRY GREENBERG,
individually,

Plaintiff–Appellee,

IDAZ GREENBERG,
individually,

Plaintiff,

versus

NATIONAL GEOGRAPHIC SOCIETY,
a District of Columbia corporation,
NATIONAL GEOGRAPHIC ENTERPRISES, INC.,
a corporation,
MINDSCAPE, INC.,
a California corporation,

Defendants–Appellants.

Appeal from the United States District Court
for the Southern District of Florida

**(June 30, 2008)**

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, MARCUS, WILSON, PRYOR and KRAVITCH, Circuit Judges.[1]

BARKETT, Circuit Judge:

Appellant National Geographic Society is a nonprofit scientific and educational organization that has published a monthly magazine since 1888.[2] The Society also produces televised programs and computer software as well as other educational products through National Geographic Enterprises, a wholly-owned and for-profit subsidiary of the Society. Appellee Jerry Greenberg is a freelance photographer, some of whose photographs were published in four issues of the National Geographic Magazine.[3]

For decades, the Society has reproduced back issues of the Magazine in bound volumes, microfiche, and microfilm. In 1997, National Geographic

---

[1] Judge Frank M. Hull recused and did not participate in this case. Senior U.S. Circuit Judge Phyllis A. Kravitch elected to participate in this matter pursuant to 28 U.S.C. § 46(c).

[2] National Geographic Society is one of three Appellants in this case. The other two Appellants are National Geographic Enterprises, Inc. and Mindscape, Inc. Mindscape is the creator of the computer program underlying the "The Complete National Geographic"—the product at issue in this case. Collectively, the three Appellants are referred to throughout this opinion as "National Geographic."

[3] Specifically, Greenberg's photographs appeared in the January 1962, February 1968, May 1971, and July 1990 issues. In each instance, after their initial publication in the Magazine, Greenberg regained ownership of the copyrights in the photographs he originally assigned to National Geographic.

produced "The Complete National Geographic" ("CNG"), a thirty-disc CD-ROM[4]

set containing each monthly issue of the Magazine, as it was originally published,

for the 108 years from 1888 through 1996—roughly 1200 issues of the Magazine.

In addition, the CNG includes a short opening montage and a computer program

that allows users to search the CNG, zoom into particular pages, and print.

Greenberg sued National Geographic, alleging that it had infringed his

copyrights by reproducing in the CNG the print magazine issues that included his

photographs.  The district court disagreed and granted summary judgment in favor

of National Geographic, holding that because the CNG constituted a "revision" of

the print issues of the Magazine, the reproduction of Greenberg's photographs in

the CNG was privileged under 17 U.S.C. § 201(c) of the Copyright Act and did not

constitute an infringement of Greenberg's copyrights.  However, a panel of this

Court in Greenberg v. National Geographic Society (Greenberg I), 244 F.3d 1267,

1275–76 (11th Cir. 2001), reversed and remanded for the district court to

"ascertain the amount of damages and attorneys fees that are, if any, due as well as

any injunctive relief that may be appropriate."  After a jury trial on damages, the

jury returned a verdict against National Geographic in the amount of $400,000.

National Geographic appealed again, this time arguing that the intervening

---

[4] CD-ROM is an abbreviation for "Compact-Disc Read-Only Memory."

decision of the U.S. Supreme Court in <u>New York Times Co. v. Tasini</u>, 533 U.S.

483 (2001), decided after <u>Greenberg I</u>, mandated a reversal of the jury verdict

against it. A second panel of this Court agreed, finding that <u>Tasini</u> compelled a

reversal of the jury verdict because, under <u>Tasini</u>'s rationale, National Geographic

was privileged to reproduce its print magazines in digital format pursuant to

§ 201(c) of the Copyright Act. See <u>Greenberg v. Nat'l Geographic Soc'y</u>

(<u>Greenberg II</u>), 488 F.3d 1331 (11th Cir. 2007).[5] This Court then vacated the

<u>Greenberg II</u> panel opinion and granted rehearing en banc to address the question

of whether National Geographic's use of Greenberg's photographs in the CNG is

privileged.

## I. DISCUSSION

The section of the Copyright Act that is relevant to the question before us,

17 U.S.C. § 201(c), was added to the copyright statute as part of the 1976

amendments to the 1909 Act, and provides:

---

[5] Subsequent to the <u>Tasini</u> decision, the Second Circuit also decided a case involving the CNG with nearly identical facts to this case. See <u>Faulkner v. Nat'l Geographic Enters. Inc.</u>, 409 F.3d 26, 36 (2d Cir. 2005) ("[The <u>Greenberg I</u>] decision addressed the application of Section 201(c) to a case virtually identical on the facts and law to the instant matter."). In that case, the Second Circuit found that (1) <u>Greenberg I</u> did not have preclusive effect because "the <u>Tasini</u> approach so substantially departs from the <u>Greenberg</u> analysis that it represents an intervening change in law rendering application of collateral estoppel inappropriate," <u>id.</u> at 37, and (2) "because the original context of the [National Geographic] Magazines is omnipresent in the CNG and because it is a new version of the Magazine, the CNG is a privileged revision," <u>id.</u> at 38.

(c) Contributions to collective works.  Copyright in each separate
contribution to a collective work is distinct from copyright in the
collective work as a whole, and vests initially in the author of the
contribution.  In the absence of an express transfer of the copyright or
of any rights under it, the owner of copyright in the collective work is
presumed to have acquired only the privilege of reproducing and
distributing the contribution as part of that particular collective work,
any revision of that collective work, and any later collective work in
the same series.

Prior to 1976, whenever freelance authors contributed to a collective work, they

risked losing their copyright in their individual works absent a printed copyright

notice in the author's name.  A freelance author could not just assign the publisher

the right of publication in the collective work while preserving her copyright in the

individual work.  The amended 1976 Copyright Act—including § 201(c)—rejected

this idea of copyright "indivisibility," instead reframing copyright as a bundle of

discrete "exclusive rights."  See Tasini, 533 U.S. at 494–96; see also 17 U.S.C.

§§ 106, 201(d)(2).  Thus, as part of its recasting of copyright as a bundle of

exclusive rights, Congress added § 201(c) to the Copyright Act in order to protect

both the copyrights of freelance authors in their individual contributions to a

collective work as well as the copyright of the publisher in the collective work

itself:

When . . . a freelance author has contributed an article to a "collective
work" such as a newspaper or magazine, . . . the [Copyright Act]
recognizes two distinct copyrighted works:  "Copyright in each
separate contribution to a collective work is distinct from copyright in

5

> the collective work as a whole . . . ." Copyright in the separate
> contribution "vests initially in the author of the contribution" (here,
> the freelancer). Copyright in the collective work vests in the
> collective author (here, the newspaper or magazine publisher) and
> extends only to the creative material contributed by that author, not to
> "the preexisting material employed in the work."

Tasini, 533 U.S. at 493–94 (citations omitted).  Congress intended this limitation

on what the author is presumed to give away primarily to keep publishers from

"revis[ing] the contribution itself or includ[ing] it in a new anthology or an entirely

different magazine or other collective work" without the author's consent.  Id. at

497 (emphasis added) (quoting H.R. Rep. No. 94-1476, at 122–23 (1976),

reprinted in 1976 U.S.C.C.A.N. 5659, 5738).

Thus, pursuant to § 201(c), and as Tasini notes, a magazine publisher is

privileged to reproduce or distribute an article—or photographs, in this

instance—contributed by a freelancer, "absent a contract otherwise providing, only

'as part of' any (or all) of three categories of collective works: (a) 'that collective

work' to which the author contributed her work, (b) 'any revision of that collective

work,' or (c) 'any later collective work in the same series.'"  Id. at 496.

National Geographic argues that it should be able to reproduce and distribute the

CNG under either the first or second prongs of § 201(c).  Greenberg, on the other

hand, argues that the CNG should be considered a "new collective work" which, he

asserts, is not entitled to any privilege under § 201(c).

6

Accordingly, we must decide whether the reproduction of the National Geographic Magazines from print to CD-ROM falls within either (a) "that particular collective work" privilege, and/or (b) the "revision of that collective work" privilege.[6] Because we conclude that the CNG is a "revision" of the original "collective works" under the second prong of § 201(c) based on Tasini's definition of "revision" in conjunction with its discussion of microform, we need not address whether it is also privileged under the first prong of § 201(c).[7]

The Copyright Act defines "collective work" as a "work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. Under the definition of "compilation," which

---

[6] The third prong of the § 201(c) privilege—"the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of . . . any later collective work in the same series"—is not at issue in this case, and National Geographic has not argued that the CNG falls within this third prong.

[7] Judge Birch devotes nearly half of his dissent to two substantive issues that have never been raised in this case. In Parts B and C of his dissent, he finds that National Geographic impermissibly transferred its § 201(c) privileges to third-parties and the § 201(c) privilege does not extend to the "public display" of Greenberg's photographs, a copyright owner's exclusive right under § 106(5). While neither of these arguments has merit, it is inappropriate to consider these issues for the first time en banc. The parties have been briefing this case for over a decade now and not once has either party argued that either of these issues is dispositive in deciding whether National Geographic is entitled to the § 201(c) privilege. Furthermore, the district court never ruled on these issues and we did not ask the parties to brief these issues. Finally, in Parts B and C of his dissent, Judge Birch relies on Tasini in finding that the § 201(c) privilege is non-transferable and "public display" is not covered under § 201(c), even though the Supreme Court explicitly stated that it "neither decide[d] nor express[ed] any view" on either issue, one of which was only raised by an amicus. 533 U.S. at 496 n.5, 498 n.8.

7

includes "collective works," a "collective work" is an "original work of authorship" insofar as it involves the selection, coordination, or arrangement of preexisting materials or data. Id.; see also id. § 102(a) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . .").

With respect to a "collective work," copyright extends only to materials contributed by the compiling author, as opposed to preexisting materials. Id. § 103(b). A copyright in a "collective work" does not imply an exclusive right in the preexisting material. Id. Here, each individual National Geographic Magazine issue—including the January 1962, February 1968, May 1971, and July 1990 print issues in which Greenberg's photographs first appeared—is a "particular collective work," and each of Greenberg's photographs is "part of" one of those collective works. National Geographic has the privilege of reproducing these individual magazine issues in print as often as it wishes, and Greenberg retains his copyrights in his individual photographs. At the same time, National Geographic has a copyright in the collective work as a whole—to wit, the individual magazine issues.

The Copyright Act does not define "revision," but Tasini does. Tasini defines "revision" as a "new 'version,' and a version is, in [the § 201(c)] setting, a

'distinct form of something regarded by its creators or others as one work.'" 533

U.S. at 500 (emphases added) (quoting Webster's Third New International

Dictionary 1944, 2545 (1976)).

In Tasini, the articles at issue—written by freelance authors—originally

appeared in the New York Times, Newsday, and Sports Illustrated.  Pursuant to

licensing agreements with two computer database companies, the publishers of the

three periodicals provided to the database companies all the separate articles from

each periodical which were then placed in electronic databases, isolated from the

context of the original print publications in which they first appeared.  Id. at

487–89.[8]  The reproduction of all articles took place without any of the freelance

authors' consent.  Id. at 489.

To resolve the case, the Court focused on whether the articles were removed

from their original context and now isolated in an entirely different context.  Id. at

503.  It noted that the three databases in question—NEXIS, the NYTO, and the

GPO—have certain differences but are all similar in that a user of any of the three

databases can only view articles in isolation of the context of their original print

_____

[8] The New York Times provided its articles to both computer database
companies—LEXIS/NEXIS and University Microfilms International (UMI).  Newsday and
Time, Inc.—the publisher of Sports Illustrated—only provided their articles to LEXIS/NEXIS.
See Tasini, 533 U.S. at 488–90.  LEXIS/NEXIS reproduced the articles in its NEXIS electronic
database and UMI reproduced the articles on two CD-ROM products—the New York Times
OnDisc (NYTO) and General Periodicals OnDisc (GPO).  Id. at 489–90.

9

publications.  For example, in NEXIS, each article appears as a "separate, isolated 'story'—without any visible link to the other stories originally published in the same newspaper or magazine edition.  NEXIS does not contain pictures or advertisements, and it does not reproduce the original print publication's formatting features such as headline size . . . ."  Id. at 490.  Like NEXIS, the NYTO shows articles with "identifying information (author, title, etc.), but without original formatting or accompanying images."  Id.[9]  Finally, the GPO did show each article exactly as it appeared in print, with photographs and advertisements, "but without any material published on other pages of the original periodical."  Id. at 500.

After finding that the individual articles were presented "clear of the context provided either by the original periodical editions or by any revision of those editions," the Supreme Court concluded that the three electronic databases did not reproduce or distribute the freelance authors' works "as part of" either the original editions or as a "revision" of those editions.  Id. at 499–500.  Because the freelance

---

[9] In his dissent, Judge Anderson points to the Supreme Court's discussion in Tasini regarding the databases (specifically, the NYTO) to find that the CNG is not a "revision" under § 201(c).  Judge Anderson notes that, similar to the CNG, the NYTO contains all the articles from one edition of the New York Times along with all the articles from other editions of that periodical on CD-ROM.  However, Judge Anderson fails to take into account the main problem with the NYTO in making his analogy—that is, like the CNG, the NYTO may have placed all the articles from one edition of the New York Times together on CD-ROM along with all the articles from other editions of the New York Times, but unlike the CNG, the individual articles were never preserved in their original context.  Thus, the analogy is wanting.

authors' articles were "presented to, and retrievable by, the user in isolation, clear of the context of the original print publication," id. at 487 (emphases added), the publishers could not claim a privilege under § 201(c).  Thus, the "crucial fact" for the Supreme Court was the databases' ability to "store and retrieve articles separately within a vast domain of diverse texts." Id. at 503 (emphasis added). The articles were presented to the user "standing alone and not in context." Id. at 488.

The Supreme Court found that by presenting the articles outside of their original context, the databases were not mere revisions of the original collective works because the publishers had done more than create a "distinct form of something regarded by its creators or others as one work." Id. at 500.  "Under § 201(c), the question is not whether a user can generate a revision of a collective work from a database, but whether the database itself perceptibly presents the author's contribution as part of a revision of that collective work." Id. at 504.[10]

_____

[10] Judge Birch explains in his dissent how a user of the CNG could extract a photograph from a scanned page of an issue of the Magazine, thereby removing it from its original context. However, this is no different from material in microform where a user can print only a portion of what is contained on a microform roll or a microfiche sheet. More importantly, this is not the proper inquiry under Tasini.  The question is whether the reproduction of a collective work "perceptibly presents" a freelancer's contribution as part of a revision of that collective work.  If the user's manipulation of a collective work, after it has been initially presented to the user, were the deciding factor in a contextual inquiry under § 201(c), then National Geographic—or any other publisher—would never be able to revise an edition of its Magazine and reproduce and/or distribute it, even in print, because a user could easily cut and isolate a photograph out of the Magazine issue.  He or she could then copy and scan the photograph and transmit it free of its

11

Therefore, "[i]n determining whether the [a]rticles have been reproduced and distributed 'as part of' a 'revision' of the collective works in issue, we focus on the [a]rticles as presented to, and <u>perceptible by, the user</u> of the [d]atabases." <u>Id.</u> at 499 (emphasis added); <u>see also</u> <u>Faulkner</u>, 409 F.3d at 38.

In sum, the teachings of <u>Tasini</u> are twofold. First, the concept of "revision" necessarily includes some element of novelty or "newness" as defined by the Court, and second, consideration of the context in which the contributions are presented is critical in determining whether that novelty is sufficient to defeat the publisher's § 201(c) privilege.[11]

Through its discussion of microform reproductions, the Supreme Court elaborated on the difference between revisions of collective works and collective works where the individual contributions have been taken out of context. <u>See</u> <u>Tasini</u>, 533 U.S. at 501. It explained that "[m]icroforms typically contain continuous photographic reproductions of a periodical in the medium of miniaturized film. Accordingly, articles appear on the microforms, writ very small, in precisely the position in which the articles appeared in the newspaper."

---

original context. Moreover, with existing technology, there is nothing to prevent an individual from scanning an existing document and isolating a portion of that document.

[11] <u>Tasini</u> does not decide, nor need we, at what point elements of novelty or "newness" make a republished collective work more than a "revision." In this case, we simply find that the degree of novelty here does not reach that level.

Id. And although "the microfilm roll contains multiple editions, and the microfilm user can adjust the machine lens to focus only on [an article], to the exclusion of surrounding material, . . . the user first encounters [the articles] in context." Id. Based on this fidelity to context, the Supreme Court reasoned that the reproduction of print publications in microform would be privileged under § 201(c). Id. at 501–02. Unlike the "conversion of newsprint to microfilm, the transfer of articles to the [d]atabases [in Tasini did] not represent a mere conversion of intact periodicals (or revisions of periodicals) from one medium to another." Id. at 502.

Applying Tasini to the facts before us, we find that the CNG is analogous to the microforms discussed therein. Similar to microfilm or microfiche, the CNG uses the identical selection, coordination, and arrangement of the underlying individual contributions as used in the original collective works. 17 U.S.C. § 101; Greenberg I, 244 F.3d at 1269; Greenberg II, 488 F.3d at 1335; Faulkner, 409 F.3d at 38. The CNG's image-based reproduction of the Magazine is like microform. The CNG presents two pages of an issue at a time, with the Magazine fold in the middle, and with the page numbers in the lower outside corners, exactly as they are presented in the print version. See Faulkner, 409 F.3d at 38. In addition to the layout of the Magazine issues, the content of the CNG is also in the same position as in the print versions of the Magazine. As we noted in Greenberg I, "[w]hat the

13

user of the CNG sees on his computer screen . . . is a reproduction of each page of the Magazine that differs from the original only in the size and resolution of the photographs and text[,] [with] [e]very cover, article, advertisement, and photograph appear[ing] as it did in the original paper copy of the Magazine." 244 F.3d at 1269; see also Greenberg II, 488 F.3d at 1335.[12]  That is, an author's contribution is viewed within its original context, with each page containing the articles, photographs, and/or advertisements as they originally appeared in the Magazine's print versions.  No alteration in positioning has been made in the CNG. A user of the CNG can focus on a particular page or parts of a page, but this is similar to microform, where the user "can adjust the machine lens to focus only on the [a]rticle, to the exclusion of surrounding material."  Tasini, 533 U.S. at 501. Thus, Greenberg's photographs do not appear disconnected from their original context.  Rather, they are firmly positioned within their original context, and a user of the CNG cannot move or alter the photographs.

The CNG is also distinct from the GPO CD-ROM of Tasini.  The GPO is an

---

[12] See Faulkner, 409 F.3d at 30–31 ("[T]here are no changes in the content, format, or appearance of the issues of the magazine.  The pages appear as they do in the print version, including all text, photographs, graphics, advertising, credits and attributions.  Issues of the Magazine appear chronologically with the first issue published appearing at the beginning of the first disk and the last appearing at the end of the last disk.  The individual images and texts are therefore viewed in a context almost identical—but for the use of a computer screen and the power to move from one issue to another and find various items quickly—to that in which they were originally published.").

14

image-based system which shows "each article exactly as it appeared on printed pages, complete with photographs, captions, advertisements, and other surrounding materials," id. at 491, making it the most similar of the three databases in Tasini to the CNG.  When a user conducts a search using the GPO, a computer program will search available indexes and abstracts, and a user may view each article within the search result.  However, "[t]he display of each article provides no links to articles appearing on other pages of the original print publications" and a user cannot simply "flip" to another article.  Id. at 491 & n.2.  In the GPO, the original context of the print publication is not perceptible to the user.  This is in direct contrast to the CNG where the user is free to flip through the pages or issues of the Magazine after conducting a search, thereby preserving the original and complete context of the print issues.[13]

Moreover, the aggregation of multiple issues of the Magazine in the CNG is no different from the aggregation of multiple editions or issues in microform. Aggregation is permissible if the original context of the individual contribution is preserved.  The Supreme Court in Tasini recognized that although "the microfilm

---

[13] Judge Anderson's dissent finds little difference between the CNG and GPO.  While the "flip" function of the GPO may not make a large difference from a marketing standpoint, it does from a legal perspective.  The GPO isolates an article clear of the context of its original print publication whereas the CNG presents an article within the Magazine's larger context as a user of the CNG can easily scroll through an entire issue of the Magazine without having to conduct an indefinite number of searches trying to retrieve each individual article from an issue, each of which is only viewable to the user standing alone.

roll contains multiple editions" of a publication, the relevant consideration was that "the user first encounters [the articles] in context." Id. at 501. The Court focused on the ability of a user to isolate an individual copyrightable article from its original collective work. Id. at 503–04. In the CNG, a user cannot "isolate" an article from its original context. Thus, that concern does not apply here. Aggregating editions or issues of one magazine into a larger collective work of that same magazine is permissible under § 201(c) insofar as the individual contributions are presented and perceivable to viewers in their original context.[14]

The legislative history supports this conclusion because it reveals that Congress intended the § 201(c) privilege to allow publishers to make revisions to collective works, but not to the individual contributions themselves. As part of the Roundtable Discussions in 1964 regarding § 201(c), a prominent author captured this sentiment:

---

[14] We find unavailing Greenberg's attempt to distinguish this case from Tasini by arguing that Tasini was a disassembly case (i.e., removing individual contributions from collective works in which they originally appeared) whereas this case is an assembly case (i.e., taking collective works with their individual contributions intact within those collective works and putting the collective works into a larger collective work). Greenberg argues that Tasini involved completely unrelated facts from this case, and that Tasini's contextual inquiry is simply a threshold question in any § 201(c) analysis. Tasini, however, never placed a caveat on the contextual inquiry by describing it as a "starting point" in a § 201(c) analysis. The Court clearly stated, without qualification, that "[u]nder § 201(c), the question is . . . whether the database itself perceptibly presents the author's contribution as part of a revision of the collective work." 533 U.S. at 504. Thus, the contextual inquiry laid out in Tasini does not turn on this assembly-disassembly dichotomy such that it need not be addressed for an assembly case. Nor is it somehow simply a threshold inquiry for any § 201(c) analysis. It is the contextual inquiry that is of fundamental import in any § 201(c) analysis.

16

I have but one question with reference to the wording, and that is with respect to the wording at the end of subsection (c): " . . . and any revisions of it." If that means "any revisions of the collective work" in terms of changing the contributions, or their order, or including different contributions, obviously the magazine writers and photographers would not object. But there is an implication, or at least an ambiguity, that somehow the owner of the collective work has a right to make revisions in the contributions to the collective work. This is not and should not be the law, and consequently I suggest that the wording at the end of subsection (c) be changed or eliminated to make that absolutely clear.

S. 3008, H.R. 11947, H.R. 12354, 89th Cong. § 14(c) (1965), reprinted in

Copyright Law Revision pt. 5, 1964 Revision Bill with Discussions and Comments

152 (Comm. Print 1965), quoted in Tasini v. N.Y. Times Co., 972 F. Supp. 804,

819 (S.D.N.Y. 1997). Congress responded by changing § 201(c) from privileging

"any revisions of it" to "any revision of that collective work." Compare Copyright

Law Revision pt. 5, at 152, with 17 U.S.C. § 201(c). And the House and Senate

Reports indicate that Congress intended that language to prevent publishers from

"revis[ing] the contribution itself or includ[ing] it in a new anthology or an entirely

different magazine or other collective work." H.R. Rep. No. 94-1476, at 122

(emphasis added).[15]

---

[15] See also H.R. Rep. No. 89-2237, at 117 (1966); S. Rep. No. 94-473, at 106 (1975), reprinted in 8 Melville B. Nimmer & David Nimmer, Nimmer on Copyright app. 4A-171 (2007). Similarly, the Register of Copyrights, which drafted § 201(c) at Congress's request, noted that "the [§ 201(c)] privileges . . . are not intended to permit revisions in the contribution itself or to allow inclusion of the contribution in anthologies or other entirely different collective works." Staff of H. Comm. on the Judiciary, 89th Cong., Copyright Law Revision pt. 6, Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965

Moreover, the legislative history exposes the flaw in Greenberg's claim that the CNG is a "new collective work," and therefore unprivileged. Even assuming that the CNG is a "new collective work," Congress intended for publishers to retain their § 201(c) privilege unless the republication constituted an "entirely different" collective work. Id.[16] Nowhere does the legislative history suggest that publishers lose their § 201(c) privilege on account of some novelty or "newness" in the republication of a collective work. Any "revision" of a collective work is, strictly speaking, a "new" collective work. Tasini, 533 U.S. at 500 (defining "revision" as

---

Revision Bill 69 (Comm. Print 1965) (emphasis added), reprinted in 9 Nimmer on Copyright app. 15-97.

[16] In addition to not appearing at all in the legislative history, the phrase "new collective works" appears only once in the Tasini opinion. The Supreme Court stated that "[i]t would scarcely 'preserve the author's copyright in a contribution' as contemplated by Congress, H.R. Rep. 122, if a newspaper or magazine publisher were permitted to reproduce or distribute copies of the author's contribution in isolation or within new collective works." Tasini, 533 U.S. at 497. This is the only time the Court uses the phrase "new collective works." Taken within the context of the passage in which it appears, the Supreme Court surely did not mean that the addition of any new element to a collective work or the placement of a "revised" collective work within a larger collective work by the same publisher deprives that publisher of its § 201(c) privilege. Within the very same sentence in which "new collective works" appears, the Court cites to the same House Report which states that a publisher cannot include the author's contribution in a "new anthology or an entirely different magazine or other collective work." H.R. Rep. No. 122-23 (emphasis added). Furthermore, in support of the Tasini sentence in question, the Supreme Court cites to a law review article. However, the page cited to by the Supreme Court does not use the phrase "new collective work" and deals solely with the danger of interpreting "revision" such that it swallows the third prong of § 201(c)—i.e., "a later collective work in the same series." See Wendy J. Gordon, Fine-Tuning Tasini: Privileges of Electronic Distribution and Reproduction, 66 Brook. L. Rev. 473, 484 (2000). The phrase "new collective work" is only used once in the law review article as well, in a sentence regarding the "distribution" of collective works which reads: "Even if a privilege were available to allow a new collective work to be made, § 201 would not cover distribution of the individually-owned articles, except in connection with the whole collective work." Id. at 499.

18

a "new" version).  Although Greenberg's photographs can be reproduced as part of the original Magazines in which they appeared, they cannot be removed from their original context and printed in an entirely different magazine or database.

Greenberg misses the mark when he argues that the CNG is not privileged because new elements have been added to the original print publications of the Magazine.  If simply adding a new element to a collective work, such as an index, table of contents or a new foreword, creates a "new collective work" outside the purview of § 201(c), then the "revision" prong is effectively nullified.[17]  The addition of new material to a collective work will not, by itself, take the revised collective work outside the privilege, and the pertinent question for a court is whether the new material so alters the collective work as to destroy its original context.[18]

---

[17] We are not persuaded by Greenberg's extension of this argument that the addition of any independently copyrightable element to a collective work renders it unprivileged.  Merely adding an independently copyrightable foreword to a collective work would not necessarily forfeit the publisher's privilege in the work.  See 2 William F. Patry, Patry on Copyright § 5:139 (2007) ("[A] revision may still include new elements such as an index, as well as some new material." (footnote omitted)).  Contrary to Judge Birch's contention in his dissent, the addition of two independently copyrightable computer programs does not divest National Geographic of its § 201(c) privilege.  Even when the degree of novelty of such an addition is sufficient to forfeit the privilege, that determination would not turn simply on the independent copyrightability of the additional element.

[18] In Judge Anderson's dissent, he gives the example of placing the March 2000 monthly edition of National Geographic devoted entirely to the geography and natural beauty of Africa into a larger book entitled "The Complete Intellectual History of Africa from 1900 to 2008" as an impermissible reproduction.  Under this opinion's reasoning, that reproduction and/or distribution would not survive the contextual analysis either and I would reach the same result.

Looking at the new elements of the CNG, we find that they do not bring the CNG outside the scope of the § 201(c) privilege. First, the brief twenty-five second montage of the introductory sequence, which serves as nothing more than a "brief visual introduction" to the image-based collection of the Magazine, does not infect the CNG such that it destroys the original context of the more than 1200 digitally reproduced issues of the Magazine. As a "virtual cover" for the Magazines, the introductory sequence in no way alters the context in which the original photographs were presented, just as a new cover on an encyclopedia set would not change the context of the entries in the encyclopedia. See Faulkner, 409 F.3d at 38 (noting that the "additional elements [of the CNG], such as, among other things, the Moving Cover Sequence . . . do not substantially alter the original context which, unlike that of the works at issue in Tasini, is immediately recognizable"). The use of Greenberg's January 1962 cover photograph in the introductory sequence, which is not just Greenberg's photograph taken apart from its original context but rather the entire original cover, does not nullify National

---

As noted earlier, a revision includes something "new" and the amount of "newness" will certainly impact the contextual inquiry. While the context of the individual contribution within its original collective work may have been preserved in the above example, that context is infected to the extent that a "user" of the larger collective work will not readily perceive the individual contribution within its original context. Thus, Tasini's contextual analysis is also dispositive in the above example and not simply a threshold inquiry.

Geographic's privilege under § 201(c).[19]

In addition to the introductory sequence, the computer program's elements, such as the search function or zoom capacity, do not take the CNG outside the § 201(c) privilege. The CNG is no different than other CD-ROM products, in that all CD-ROMs contain an operating computer program that directs their functionality. The CNG's computer program simply compresses and decompresses the digital images of the Magazine issues while allowing a CNG user to search an electronic index of the Magazines. The search function of the computer program is akin to a traditional index, except that it is a by-product of the medium in which it finds its functionality. Just as a reader of a bound-volume of previous issues of National Geographic might look to an index to find all the pages in which the phrase "global warming" appears, a user of the CNG's search function can enter the phrase "global warming" and the program will retrieve for the user all those same pages. The CNG user is then free to flip through other pages of the issues without having to conduct a new search. Similarly, the zoom function, while allowing a CNG user to focus on a specific part of a page, does not deprive National Geographic of its privilege because, just like adjusting a lens to look at a specific part of a page of a publication reproduced on microform, the page in

---

[19] Even though the introductory sequence does not deprive National Geographic of its § 201(c) privilege, we are only deciding that the CNG as a whole is privileged.

21

question first appears to the reader in context. See Tasini, 533 U.S. at 501. These added features only serve to provide functionality to "the CNG's raison d'être"—i.e., the intact collected issues of the Magazine. See Greenberg I, 244 F.3d at 1269. The CNG's new elements are no different than microform's "new" elements, such as a zoom lens or the ability to print only a portion of a document. These additional features do not destroy the original context of the collective works.

We see no material distinction between the CD-ROMs at issue here and the permissible "revision" of a collective work into microform as discussed in Tasini. The fact that the CNG is on CD-ROMs in digital form does not make the microform analogy any less relevant.[20] The conversion of magazine issues from print to digital form—as opposed to their conversion from print to print, or print to microform—does not create a different balance of copyright protection under

---

[20] Greenberg seeks to distinguish microform from the CNG based primarily on an economically-driven argument—he argues that microform has no commercial value. However, there is nothing in the record to suggest that microform has no commercial value. The question of whether the reproduction of a collective work creates a "new market" is legally irrelevant to a § 201(c) privilege analysis. The protection afforded an author's individual contribution does not vary with the market value of the collective work or a revision of the collective work in which it appears. Contrary to Judge Birch's view, this case is not simply "about who gets the money." The fact that a publisher can resell a collective work for a profit with a freelancer's individual contribution in it is not determinative of whether that reproduction and/or distribution of the collective work is privileged as a "revision" under § 201(c). Under an extension of Judge Birch's view, republishing an old magazine issue in its original format to a younger, new market would not be permissible. The economic inquiry is clearly not the question. Rather, it is a question of whether the publisher has a privilege to reproduce and/or distribute "that particular work," not whether that reproduction and/or distribution is targeted at a new market.

§ 201(c) between individual authors and publishers because copyright protection is

media neutral.  See 17 U.S.C. § 102(a) (noting that "[c]opyright protection subsists

. . . in original works of authorship fixed in any tangible medium of expression,

now known or later developed, from which they can be perceived, reproduced, or

otherwise communicated . . ." (emphasis added)).  Tasini explained that the long-

embraced doctrine of media neutrality mandates that the "transfer of a work

between media does not alter the character of that work for copyright purposes."

533 U.S. at 502 (internal quotations and brackets omitted); see also Faulkner, 409

F.3d at 40 ("The transfer of a work from one medium to another generally does not

alter its character for copyright purposes.").

　　　To this end, Congress adopted broad statutory language including within

copyright's ambit all existing and later developed media through which works

could be communicated either directly or with the aid of a device.  See 17 U.S.C.

§§ 101, 102(a).  The legislative history underscoring the adoption of this doctrine

explains:

> This broad language is intended to avoid the artificial and largely
> unjustifiable distinctions . . . under which statutory copyrightability in
> certain cases has been made to depend upon the form or medium in
> which the work is fixed.  Under the bill it makes no difference what
> the form, manner, or medium of fixation may be—whether it is in
> words, numbers, notes, sounds, pictures, or any other graphic or
> symbolic indicia, whether embodied in a physical object in written,
> printed, photographic, sculptural, punched, magnetic, or any other

23

> stable form, and whether it is capable of perception directly or by
> means of any machine or device "now known or later developed."

H.R. Rep. No. 94-1476, at 5665. Because the principle of media neutrality is a

staple of the Copyright Act, 17 U.S.C. § 102(a), Tasini, 533 U.S. at 502, it is

incorrect to say that an exact digital replica of a print magazine is somehow a "new

collective work."

Furthermore, the fact that a computer program allows CNG users to search

and access—without altering—the collective works in their exact original form and

context does not change our § 201(c) analysis. As technology progresses and

different mediums are created through which copyrightable works are introduced

to the public, copyright law must remain grounded in the premise that a difference

in form is not the same as a difference in substance. "No one doubts that [a

publisher] has the right to reprint its issues in Braille, in a foreign language, or in

microform, even though such revisions might look and feel quite different from the

original. Such differences, however, would largely result from the different

medium being employed." Tasini, 533 U.S. at 512–13 (Stevens, J., dissenting).

Thus, the revision of a magazine by reproducing it in its original context in a new

"distinct form"—i.e., a digital version—is not a difference that would undo a

publisher's privilege under § 201(c). See id. at 500.

With publications continuously being reproduced in new mediums, courts

24

should not disapprove of the reproduction or distribution of collective works in those mediums without evaluating whether the publisher has violated the contextual fidelity of the original collective work or revised the individual contribution itself. Courts must determine whether the addition of new materials to the reproduction creates an "entirely different" collective work which falls outside § 201(c)'s privilege, not whether the medium itself presumptively creates a "new collective work." Greenberg's copyrights in his individual contributions to the National Geographic Magazine issues and National Geographic's copyrights in the collective works—and National Geographic's privilege of reproducing and distributing the collective works—were not determined thirty years ago based on the medium in which they were produced, and they should not be determined on that basis today.

## II. CONCLUSION

In the light of the Supreme Court's holding in <u>Tasini</u> that the bedrock of any § 201(c) analysis is contextual fidelity to the original print publication as presented to, and perceivable by, the users of the revised version of the original publication, we agree with the Second Circuit in <u>Faulkner</u> and find that National Geographic is privileged to reproduce and distribute the CNG under the "revision" prong of § 201(c).

25

The CNG—albeit in a different medium than print or microform—is a permissible reproduction of the National Geographic Magazine. Greenberg's photographs are preserved intact in the CNG and can only be viewed as part of the original collective works in which they appeared. Similar to the microforms of Tasini, which preserve the context of multiple issues of magazines, the CNG's digital CD-ROMs faithfully preserve the original context of National Geographic's print issues. The CNG's additional elements—such as its search function, its indexes, its zoom function, and the introductory sequence—do not deprive National Geographic of its § 201(c) privilege in that they do not destroy the original context of the collective work in which Greenberg's photographs appear.[21]

We **REVERSE** and **REMAND** to the district court for proceedings consistent with this opinion.

---

[21] The only issue addressed en banc is whether the CNG itself is privileged under § 201(c). We adopt and reiterate the holding of the panel in Greenberg II that the introductory sequence itself is not privileged under § 201(c). 488 F.3d at 1339. On remand, the district court must consider National Geographic's other defenses not yet adjudicated with respect to its liability for the use of the 1962 cover photograph in the introductory sequence. Likewise, because the CNG is privileged and other defenses relating to the introductory sequence have not been adjudicated, we also adopt the Greenberg II panel's holding that the district court erroneously permitted the jury to find that National Geographic willfully violated § 201(c). Id. at 1341.

BIRCH, Circuit Judge, dissenting, in which WILSON, Circuit Judge, joins, and in which EDMONDSON, Chief Judge, and ANDERSON, Circuit Judge, join in Part A only:

I respectfully dissent. I also concur in Judge Anderson's dissent.

The controlling issues and facts in this case have not been fully identified by the majority --- hence, it is not surprising that it reaches the wrong conclusions.

Putting aside the legal analysis or rationales in play in this case, the reader should understand the pecuniary or commercial positions of the parties and their constituencies in this dispute. On one side there are the artists, authors, and other creators of copyrightable works who argue that their creative contributions to collective works already exploited by publishers should not be further exploited by those publishers without sharing the profits realized by that further commercial exploitation. These authors, artists, and other creators contend that the publishers now want to ignore the economic compromise — the balancing of equities — that is reflected in 17 U.S.C. § 201(c) of the 1976 Copyright Act.[1] Hereinafter, all

---

[1] The 1976 Copyright Act was supposed to reverse two hundred years of publishers' exploitation of authors under the 1909 Copyright Act. See Barbara Ringer, First Thoughts on Copyright Act of 1976, 22 N.Y.U. Sch. L. Rev. 477, 490 (1977) ("Barbara Ringer, the Register of Copyrights, more than any other single person, is responsible for the content of the new law . . ." Melville Nimmer, Preface to the 1978 Comprehensive Treatise Revision of 1 Melville Nimmer, The Law of Copyright, at vi (1983)). Marybeth Peters, a later Register of Copyrights, echoed this in her 2001 letter to Congress regarding New York Times Co. v. Tasini, 533 U.S. 483, 121 S. Ct. 2381 (2001):

Section 201(c) was intended to limit a publisher's exploitation of freelance

27

statutory citations are to Title 17 of the U.S. Code, unless otherwise indicated.

On the opposite side, the publishers are seeking to generate new revenues by repackaging an old product — the "old wine in new bottles" paradigm; updated in this instance with an easier access twist-off metal cap rather than a cork. Here the new packaging of the old content, *replicated but unrevised*, in electronic medium is both cost-efficient, profitable, and attractive to a new, computer-savvy generation of consumers. Moreover, the profits are enhanced exponentially when the

---

authors' works to ensure that authors retained control over subsequent commercial exploitation of their works.

In fact, at the time § 201 came into effect, a respected attorney for a major publisher observed that with the passage of § 201(c), authors "are much more able to control publishers' use of their work" and that the publishers' rights under § 201(c) are "very limited." Indeed, he concluded that "the right to include the contribution in any revision would appear to be of little value to the publisher." Kurt Steele, "Special Report, Ownership of Contributions to Collective Works under the New Copyright Law." Legal Briefs for Editors, Publishers, and Writers (McGraw-Hill, July 1978).

In contrast, the interpretation of § 201(c) advanced by publishers in *Tasini* would give them the right to exploit an article on a global scale immediately following its initial publication, and to continue to exploit it indefinitely. Such a result is beyond the scope of the statutory language and was never intended because, in a digital networked environment, it interferes with authors' ability to exploit secondary markets. Acceptance of this interpretation would lead to a significant risk that authors will not be fairly compensated as envisioned by the compromises reached in the 1976 Act. The result would be an unintended windfall for publishers of collective works.

147 Cong. Rec. E182-02 (2001) (Letter from Marybeth Peters, The Register of Copyrights of the United States of America, to Representative James P. McGovern, United States House of Representatives (Feb. 14, 2001)). *See* Jessica D. Littman, Copyright Compromise, And Legislative History, 72 Cornell L. Rev. 857, 893-96 (Interpreting Bargains) (1987).

publisher can exclude the contributing artists, authors, and creators of the content from sharing in those profits.  At the end of the day this case is not about education, access by the masses, or efficient storage and preservation — it is about who gets the money.   The legal arguments and non-legal arguments on both sides, not surprisingly in a free enterprise society, reduced to these essentials are all about who is paid for their contributions and efforts.  Accordingly, it is probative and pertinent to examine the Congressional motivation for passage of the statutory section — §201(c) — central to the present dispute.   If the motivating idea and intent of Congress was to require the publishers to share profits from a new or different product (in copyright terms —  a "work") placed on the market, then the authors, artists, and creators win.  If the intent of Congress was to allow an up-to-date, modern, handy, and desirable incarnation of the previously exploited work, then the publishers win.  I will endeavor to demonstrate that the authors, artists, and creators should share in the publisher's profits and that the arguments, both legal and policy, by the publishers are bereft of logic, legal merit, and are totally disingenuous.[2]

    There are at least three distinct legal rationales that support affirmance of the

---

[2] It should be emphasized that the proper copyright analysis examining this commercial product, the "The Complete National Geographic" ("CNG"), should be no different than if the collection were of Playboy or Hustler magazines.  Just as the medium is "neutral" so is the content for copyright purposes.

judgment of the district court which followed our court's directions in <u>Greenberg</u>
<u>v. Nat'l Geographic Soc'y</u>, 244 F.3d 1267 (11th Cir. 2001) ("<u>Greenberg I</u>").  Each
of these legal rationales are based upon core copyright law principles applied to the
facts existing in this record.  Application of each such rationale demonstrates the
erroneous conclusions and logic of the majority.  The three rationales, succinctly
stated, are as follows:

(A)    the CNG is a "new," "entirely different" collective work to which the
putative § 201(c) privilege does not attach and does not reproduce and
distribute articles as "part of that collective work" or "any revision"
thereof;

(B)    the National Geographic Society ("the Society") cannot transfer its
privilege to third parties to exercise; and,

(C)    the Society and its co-infringers have undertaken to *display*
Greenberg's protected works *publicly* by means of projection on a
computer screen, a non-privileged exercise by a § 201(c) grantee.

In the corresponding sections of my dissent, I shall demonstrate that the Society
and its co-defendants have infringed the registered copyrights of plaintiff
Greenberg.  I shall endeavor to demonstrate the CNG is a non-qualifying (per §
201(c)) "new collective work," not due to its "revision" or "non-revision" status,

30

but because it is a rote copy of the magazines scanned onto CD-ROMs (an analogous replica to a microform replica) which has been combined with at least two copyrightable computer programs, each a free-standing and sui generis copyrightable work.

Necessary to my discussion that follows are some material record facts which have been omitted by the majority. In September 1996, National Geographic Interactive[3] ("NGI") entered into a Distribution Agreement with Mindscape, Inc., a Delaware corporation. "Mindscape is a computer software publisher and distributor which collaborates with the Society in its efforts to bring its products to the public in the digital environment." R1-19 at 2. Pursuant to the Distribution Agreement, the Society and Mindscape developed the product marketed as the CNG. The CNG is a thirty CD-ROM compendium that collects an edition of *each issue* of The National Geographic Magazine ("the Magazine") ("that particular collective work") from 1888 to 1996. Under the "Distribution

---

[3] National Geographic Interactive is a division of National Geographic Enterprises, Inc. National Geographic Enterprises, Inc. was a wholly-owned for-profit subsidiary of National Geographic Ventures, Inc., which was a wholly-owned for-profit subsidiary of the Society. National Geographic Ventures, Inc. has since been dissolved. Faulkner v. Nat'l Geographic Enter., 409 F.3d 26, 31 (2d Cir. 2005). National Geographic Interactive and National Geographic Enterprises, Inc., along with National Geographic Holdings, Inc., are now incorporated as NGHT, Inc., a wholly-owned, for-profit subsidiary of the Society. Id. at n.4.

Agreement," NGI would receive royalties on sales of the CNG by Mindscape.[4] R5-284, Joint Trial Exh. 323 at 13-15.

In December 1996, the Society entered into a "Trademark and Copyright License Agreement" ("License Agreement") with National Geographic Ventures, Inc. ("NGV"), a for-profit subsidiary of the Society. The License Agreement was premised upon the Society's decision to "to establish its electronic publishing and cartographic operations as units of a separate but wholly owned taxable subsidiary." R5-284, Joint Trial Exh. 323 at 1. Under the License Agreement, the Society granted NGV a "royalty bearing license for certain . . . copyrighted materials of [the Society]," including "[t]he Archive of National Geographic Magazine *for reproduction in archival form only, without manipulation or alteration*." Id. at 1, Att. B (emphasis mine).

To create the CNG, the Society entered into an agreement with Dataware Technologies, Inc. ("Dataware"), dated 15 August 1996, to digitally scan the pages of the Magazine.[5] The agreement authorized Dataware to "develop a custom CD-

---

[4] The parties stipulated that the Society would "receive royalties on all sales [of the CNG] by Mindscape." RAcc#2-230 at 10. However, upon a reading of the Distribution Agreement, it appears that NGI, not the Society, received such royalties. R5-284, Joint Trial Exh. 323 at 13-15. This appears to be consistent with the apparent rationale for the Society in creating for-profit subsidiaries in order to avoid direct receipt of disqualifying income by a non-profit corporation.

[5] A copyright notice appearing on the packaging of the CNG states that the Society holds the copyright in the CNG, and that the CNG "was produced from an archive of magazines

32

ROM template, including integration of a custom set of interfaces to display magazine pages and . . . JPEG images of the scanned pages." R4-203 at 8. "Each issue [of the Magazine] was [] scanned, page by page, into a computer system. The scanning process created an *exact image* of each page as it appeared in the Magazine. R1-23 at 2 (emphasis mine).

Mindscape developed a computer program (the "Program"), which is contained on each CD-ROM of the CNG, to allow the user of the CNG to select, view, and navigate through the images of the Magazine replica (the "pages" of the magazines) on the CD-ROM. Greenberg I, 244 F.3d at 1269.[6] Without the Program, the pages could be stored on a CD-ROM, but they would not be *efficiently* accessible to the user. Id. at 1270. In creating the Program, Mindscape

_____

collected in a central repository and is not representative of any single regional edition of NATIONAL GEOGRAPHIC magazine." R1-20, Exh. A.

[6] It is not disputed that a computer program is a form of literary work, and thus is copyrightable. See Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright § 2.04[C] (2008). The 1980 amendments to the Copyright Act brought computer programs within the scope of copyright by adding them to the list of defined works and providing for limitations on the reproduction and adaptation rights in favor of owners of copies of programs. See §§ 101, 117. These amendments were recommended by the Commission on New Technological Uses of Copyrighted Works which concluded that computer programs were the proper subject matter of copyright. See Nat'l Comm. on New Technological Uses of Copyrighted Works, Final Report 1 (1978). Moreover, courts have recognized the audiovisual displays produced by a computer programs as a *separate* copyrightable work. See Stern Elecs. Inc. v. Kaufman, 669 F.2d 852 (2d Cir. 1982). Electronic media inherently pose problems in delineating the by-products of original works, such as derivative works, collective works, and revisions. Bits of computer code may represent content (text, graphic images, and the like) or encode functional, stand-alone computer programs – thereby intertwining content and method of delivery. See Micro Star v. Formgen, Inc., 154 F.3d 1107 (9th Cir. 1998).

incorporated two separate, copyrighted computer programs: the "CD Author Development System," which is a search engine created by Dataware, and the "PicTools Development Kit," which is a storage mechanism created by Pegasus Imaging Corp. for compressing and decompressing the images scanned onto each disc. Id. at 1269-70. Mindscape has not registered a copyright in the Program, id. at 1270 n.3, but the claims of copyright for both the CD Author Development System and the PicTools Development Kit, respectively, have been registered with the Copyright Office. Id. at 1269-70.

Part of the Program consists of "a search engine based on the National Geographic Society proprietary indexing scheme."[7] R1-20 at Ex. B, p. 2. The search engine "contains the same information as the print indices published by the Society," RAcc#2-230 at 10, and it allows the user of the CNG to access articles "by topic, title, key word, or contributor." Greenberg I, Appellants' Br. at 7. The Program also contains "a feature for saving search results," R4-203 at 10, which

---

[7] In 1988, National Geographic published a "100-year index." That index is a separately bound volume consisting of an index to the first 100 years of National Geographic Magazine. R11 at 183-84 [Idaz Greenberg - Jury Trial Cross Examination]. There are "[v]ery little similarities" between the CD-ROM index and the print index. "When you have the paper index, the year's index, you can find anything in the world that you want to find there, but you're not going to be able to print it out and you're not going to have access to it, and it's not going to be right there at our fingertip. Whereas, when you have the product, the CD-ROM [CNG], whatever you find in the search engine you can immediately access and immediately print [and] copy." R11 at 143-44 (Idaz Greenberg - unrefuted Jury Trial Direct Testimony).

34

would allow a user to repeatedly access the results of a former search, but "[t]here is no text-based search capability." Greenberg I, Appellees' Br. at 25.

Using any CD-ROM of the CNG, a user therefore can locate, isolate, copy, and print or transmit any photograph through the following steps. First, run the CD-ROM using Windows Explorer® (extant at the publication of the CNG) and open the folder labeled "IMAGES" from within the CD-ROM. Then, open one of the subfolders contained in the IMAGES folder. Each image contained in the subfolder will be displayed, and each such image is a single scanned page of an issue of the Magazine. Next, right-click on an image, place the cursor over "Open With," and then choose "Paint." Using the "Select" tool provided by "Paint," select only the photograph, omitting all other material contained in the image. Right-click in the selected photograph and choose "Copy." Then, from the "File" menu in the toolbar, left-click "New," which creates a new blank document. Within the new document, right-click and choose "Paste." The new document will now contain only the photograph extracted from the scanned page, free of any of the other material originally contained on the page as it was scanned into the CD-ROM. Copies of the photograph now can readily be made and printed or transmitted. See R1-20, Exh. A.

A.

The holding in New York Times Company, Inc. v. Tasini ("Tasini"), 533

U.S. 483, 488, 121 S. Ct. 2381, 2384-85 (2001) is as follows:

> **In agreement with the Second Circuit, we hold that § 201(c) does not authorize the copying at issue here.  The publishers are not sheltered by § 201(c), we conclude, because the databases *reproduce and distribute articles* standing alone and not in context, *not "as part of that particular collective work"* to which the author contributed, "*as part of . . . any revision"* thereof, or "as part of . . . any later collective work in the same series."  Both the print publishers and the electronic publishers, we rule, have infringed the copyrights of the freelance authors.**

(emphasis mine).

The Society desires to license the use of certain photographs in a new

assembly of its previously published magazine series, but does not want to pay the

contributing photographers to do so.  To succeed, the CNG must qualify for the

protection of the privilege extended by § 201(c).  However, the *assembly* of

"[*those*] particular collective *work*[*s*]" – 1,200 magazines – is a far different

undertaking, in a practical as well as a copyright sense, than the permitted § 201(c)

*reproduction* or *republication* of "*that* particular collective *work*" – each issue of

the magazine.

Until the case returned to our court for oral argument, generally the

36

appellants traveled on the "revision" prong of § 201(c).[8]  Now, glossing over or

---

[8] The appellants have changed their legal position in this case more than a politician running for election.  In February of 1998 in the district court they argued: "CD-ROM 108 [the CNG] thus does not qualify as a *new collective work* for purposes of § 201(c) because it does not differ in any material creative respect from paper copies of the Magazine.  As a straightforward reprint of the Magazine, the Society is entitled to publish it pursuant to § 201(c) . . . Thus, revisions of a particular collective work and later collective works in the same series --- both explicitly authorized by § 201(c) --- are clearly 'new' collective works.  For example, 'a "revision" can alter a preexisting work by a sufficient degree to give rise to a new original creation." [citing the *Tasini* district court opinion].  Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Count II And to Dismiss for Summary Judgment on Counts III-V of Plaintiffs' Amended Complaint.  R1-28 at 4-5 (emphasis mine).  In their November 1999 "Memorandum of Law in Opposition to Plaintiffs Motion to Vacate Order Granting in Part Defendants' Motion for Partial Summary Judgment, and for other Relief," R1-62, appellants made the following statement in judicio: "**CD-ROM 108 [the CNG] is merely a republication, *not a revision*, of the Magazine** . . . CD-ROM 108 is nothing more than a collection of issues of the Magazine in a different medium . . ." Id. at 7-8.  In their initial brief to our court in Greenberg I, appellants continued to assert and concede that CNG is indeed a "new" collective work but qualified that concession by claiming that: "SECTION 201(c) OF THE COPYRIGHT ACT PERMITS THE SOCIETY TO PUBLISH CD-ROM 108 [THE CNG] AS A REVISION EVEN IF IT IS A *NEW COLLECTIVE WORK*, NOTWITHSTANDING THE SECOND CIRCUIT'S OPINION IN *TASINI* . . . Thus, revisions of a particular collective work and later collective works in the same series . . . are clearly 'new' collective works."  Brief in Opposition to Initial Brief of Jerry Greenberg and Idaz Greenberg, 19-20.  To further fortify their concession appellants added the following definition: "To 'revise' something means to 'make a new, amended, improved, or up-to-date version' of it.  Webster's Ninth New Collegiate Dictionary at p. 1010." Id. at 22.  Just as the chamaeleon politician changes position with the most recent poll, our appellants have changed their legal position and rationales as the Tasini case worked its way through the courts.  However, as I have endeavored to demonstrate in this dissent, the CNG is a non-qualifying (per § 201(c)) new collective work, not due to its "revision" or "non-revision" status, but because the essentially archival copy of Magazines scanned into CD-ROMs (the most analogous replica to the microform replica) has been combined with at least two copyrightable (and in one case registered) computer programs — each a free-standing, sui generis copyright-eligible work.  Thus, as the appellants correctly conceded in their zig-zag argument trail, the CNG is not any sort of revision — it is an *exact replica* placed in a different medium; which mere placement does not constitute a "revision."  Moreover, the act of scanning is all that is necessary to place the rote copy of the Magazine into the digital medium.  The "assembly" of these, "separate and independent works in themselves" [the replica and the computer programs] constitute a "new" and, even "completely different," collective work.  See § 101 definition of "collective work" which in pertinent part provides: "A 'collective work' is a work . . . , in which a number of contributions, constituting separate and independent works in themselves, are *assembled* into a collective whole."

misstating the meaning of "that particular collective work" (which is limited to, and descriptive of, **each individual issue** of the magazine), they claim the Society may license a reproduction or republication of all issues, collectively in a new anthology or aggregation, so long as each replication is in "context" per Tasini. Recall, however, that Tasini factually was a "disassembly" case not an "assembly" case. The Court focused on textual and pictorial context, in a *threshold* examination, to determine whether a "particular collective work" even existed in order to ascertain whether the § 201(c) "revision privilege" was available. The Court determined that it was not, and it never reached the controlling issue presented in our case as to whether an *assemblage* is privileged under § 201(c). As discussed below, an assemblage of a replica and copyrightable computer programs is not privileged because a "new collective work" is *expressly not included* in § 201(c) per House Report No. 94-1476, at 122, as reprinted in 1976 U.S.C.C.A.N. 5659, 5737 (hereinafter "H.R. Rep.") and each "particular collective work" (each issue of the Magazine) is not part of a "revision." Thus the Society has failed to grapple with the reality that such a heretofore non-existent aggregation of the 1,200 magazines has now been assembled into what constitutes a "new collective work."[9]

---

[9] "The term 'compilation' includes collective works." § 101. The definition of "collective work," per § 101 in pertinent part: ". . . is a work, such as a[n] . . . . anthology . . .in which a number of contributions, consisting of separate and independent works in themselves [here, each issue of the magazine as well as at least two computer programs], are *assembled* into

38

The Society represented, in its claim of copyright for the CNG ("108 Years of National Geographic Magazine on CD-ROM"), that the CNG is a "Compilation of Pre-Existing Material Primarily Pictorial" under section 6 [entitled "Derivative Work Or Compilation"].  Per H. R. Rep., cited by the Second Circuit, the Supreme Court, and the Greenberg I panel, this assemblage actually constitutes a "new collective work" which is not embraced, and is *expressly excluded*, from the scope of § 201(c).[10]  This assemblage is a new product and a public dissemination that totally eviscerates the economic value of the contributors' rights under § 201(c).  If the Society is also relying on the second, or "revision" prong of § 201(c), as it has (from time to time) until now, its argument fails because *no revisions have been made to the magazines*.  No revisions have been made because nothing has been "revised."[11]  Accordingly, since § 201(c) specifically provides that a reproduction and distribution can only occur "as part of" a later edition or *revision*, a publisher infringes a freelance contributor's work by either a reproduction or a distribution

---

a collective whole [here, the CNG]."

[10] H.R. Rep. No. 94-1476, at 122-23; Tasini v. New York Times Co., 206 F.3d 161, 167 (2d Cir. 2000); Tasini, 533. U.S. at 495, 121 S. Ct. at 2388; Greenberg I, 244 F.3d at 1273.

[11] "A revision is commonly understood as a purposeful alteration of content undertaken for some substantive reason . . . .  Likewise when an exact replica of the original work is produced the result is not a revision because nothing has been 'revised.'" Lateef Mtima, Tasini and its Progeny: Exclusive Right or Fair Use On the Electronic Publishing Frontier?, 14 Fordham Intell. Prop. Media & Ent. L.J., 369, 423-26 (Winter 2004) (hereinafter "Mtima").

that takes place not "as part of a revision." <u>Ryan v. Carl Corp.</u>, 23 F. Supp. 2d

1146, 1149 n.2 (N.D. Cal. 1998) (Judge Fern Smith got this important aspect of the

case right even before the Second Circuit and Supreme Court in <u>Tasini</u>).

     As the appellants have conceded and recognized they must demonstrate that

the CNG constitutes a "collective work" that each of the defendants[12] are

privileged under § 201(c) to reproduce and distribute.[13]  By its express terms, §

201(c) protects and refers to only "collective works" and confers a "privilege" only

to "the owner of the copyright in *the collective work*."  § 201(c) (emphasis mine);

<u>see also</u> H.R. Rep. (referencing § 201(c) and the definition of "collective work" in

§ 101 and stating that § 201(c) "deals with the troublesome problem of ownership

of copyright in contributions to 'collective works.'"  Under these statutory

---

    [12] Copyright in each separate contribution to a *collective work* is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of *reproducing* and *distributing* the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

    [13] As will be discussed below, only appellant Society (a non-profit entity) holds the § 201(c) privilege.  However, the record is clear that a separate legal entity, National Geographic Enterprises, Inc. a for-profit subsidiary corporation, together with an independently owned corporation, Mindspring, Inc., actually reproduced and distributed the CNG.  As explained below, the § 201(c) privilege is personal to the Society and may not be transferred to another person (i.e., legal entity).  Yet it is these two other legal entities that are commercially exploiting the plaintiff's copyright and contributions or works, purportedly under the auspices and cover of the § 201(c) privilege as to which the law negates their putative claim.

definitions,[14] as clarified by the referenced legislative history, the CNG is a "new collective work." Before examining why the CNG is a new collective work, recall that the Tasini case involved a factual situation that was totally different from the facts in this case. That case was a *disassembly* case not an *assembly* case — as is this case. This assemblage know as "the CNG" does not constitute a privileged revision because it is, at the very least not a revision and, moreover, is a new and different collective work that Congress expressly exempted from the coverage of § 201(c)[15] and does not constitute a revision, much less "part of . . . any revision" of "that particular collective work." Tasini, 533 U.S. at 488, 121 S. Ct. at 2384-85.

The Second Circuit decision in Tasini, affirmed by the Supreme Court, began with the undisputed assumption that: "[T]he electronic databases are neither the original collective work — the particular edition of the periodical — in which the [a]uthors' articles were published[,] nor a later collective work in the same series." Tasini, 206 F.3d 161, 166 (2d Cir. 2000), aff'd, 533 U.S. 483, 121 S.Ct.

---

[14] A **"collective work"** is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of *contributions, constituting separate and independent works in themselves*, are *assembled* into a collective whole. A **"computer program"** is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result. § 101 (emphasis mine).

[15] H.R. Rep. at 122-23 (. . . the publisher could not revise the contribution itself or *include it in a new anthology or entirely different magazine or other collective work*." (emphasis mine). See Tasini, 533 U.S. at 495, 121 S. Ct. at 2388; Tasini v. New York Times Co., 206 F.3d at 167; Greenberg I, 244 F.3d at 1273.

41

2381 (2001).[16]  That reasoning left only the "revision" prong of § 201(c) remaining

to the publishers.  Then, the Second Circuit rejected the publishers' contention

"that each database constitutes a 'revision' of the particular collective work in

which each [a]uthor's" contribution first appeared.  Id. at 166.  The Second Circuit

correctly explained – just as our Greenberg I opinion agreed — "[t]he most natural

reading of the 'revision' of 'that collective work' clause is that Section 201(c)

protects only later editions of a particular issue of a periodical, such as the final

edition of a newspaper."  Id. at 167.

This analysis by the Second Circuit also correctly observed, interpreting the

legislative history explaining the introduction of § 201 into the then-new 1976

Copyright Act, that:  "the 'revision' clause in Section 201(c) was not intended to

permit the inclusion of previously published freelance contributions 'in a new

anthology or an entirely different magazine or other collective work,' i.e., in later

---

[16] The "work" referred to in § 201(c) is the individual periodical or encyclopedia, not a
collection of periodicals or sets of volumes over dozens of years.  The drafters of the statute
clearly had in mind the narrower idea of a single issue of a periodical, not the entire series of
periodicals.  The terminology "that particular collective work" certainly suggests this:  The
legislative history refers to individual "editions" and "volumes."  See H.R. Rep. at 122-23 (under
section 201(c) "a publishing company could reprint a contribution from one issue in a later issue
of its magazine . . . .") (emphasis mine).  Section 101 of the Copyright Act refers to a "a
periodical issue" in the definition of a collective work.  See also Tasini, 206 F.3d at 167 ("'that
particular collective work' means a specific edition or issue of a periodical") (emphasis mine).
To the question "if the publishers can publish revisions issue by issue, then why can't they put
all the issues together[?];" the answer would be:  "the resulting compilation is a new anthology
or new collective work, rather than a revision of 'that collective work.'"

collective works not in the same series." Id. (citing H.R. Rep. at 122-23). The panel emphasized that: permissible uses under § 201(c) "are an exception to the general rule that copyright vests initially in the author of the individual contribution"; and warned that "[w]ere the permissible uses under Section 201(c) as broad and as transferable as [publishers] contend, it is not clear that the rights retained by the [a]uthors could be considered 'exclusive' in any meaningful sense." Id. at 168. The Tasini panel also noted in a footnote that: "Section 201(c) grants collective works authors 'only' a 'privilege' rather than a 'right.' Each of these terms connotes specialized legal meanings, and they were juxtaposed by Congress in the same sentence of Section 201(c)." Id. at 168 n.3.

Thus, both the Second Circuit in Tasini and our court in Greenberg I concluded that a "new anthology" or "new collective work" was not within the "revision" privilege of § 201(c) or otherwise protected within the limited scope of § 201(c). The Supreme Court's affirmance of the Second Circuit's opinion in Tasini, not only failed to diminish the force and effect of both the Second and Eleventh Circuit opinions that had issued before the Court ruled, but rather fortified those respective courts' analyses of how new collective works ("other

43

collective works") are beyond the scope of the § 201(c) privilege.[17]  Specifically,

the Court explained that:

> § 201(c) adjusts a publisher's copyright in its collective work to accommodate a freelancer's copyright in her contribution.   If there is demand for a freelance article standing alone or in a *new collection*, the Copyright Act allows the freelancer to benefit from that demand; after authorizing initial publication, the freelancer may also sell the article to others.

Tasini, 533 U.S. at 485, 121 S. Ct. at 2383 (emphasis mine).  The Court stressed

---

[17] See Mtima, at 425 ("The content-altered digital re-publications in Tasini and Greenberg were held to virtually extinguish any secondary market for the contributory works contained therein, because once available online, there would be little need for alternative access to the works.  An exact digital replica of a collective work, particularly when disbursed into an online commercial database, would likely have the same effect.  Accordingly, exact digital replicas can be disqualified from § 201(c) revision status on the same market impact grounds as the content-altered digital re-publications at issue in Tasini."). [T]he [Tasini] Court ruled that to allow the digital re-publications as privileged revisions would defeat the legislative objective underlying § 201(c) . . . the Court found that the development of digital technology has resulted in the creation of a secondary 'stand alone' market for the individual contributions to collective works and construed that Congress intended that the contributory authors, as opposed to the publishers, be the ones to benefit from such new markets . . . . [T]hus the secondary, 'stand alone' re-publication market that § 201(c) restores to individual contributing authors had been usurped by the publishers." Id. at 388-89 (citations omitted); see also, Thomas Dallal, Faulkner v. National Geographic Enterprises, Inc.: Driving a Truck Through the Eye of a Needle, 15 Tex. Intell. Prop. L.J. 63, 82-84 (2006) ("A recent article . . . defines 'media neutrality' to mean that a 'copyright owner's rights should be the same regardless of the form, whether analog or digital, in which the work may be embodied or fixed.' . . . Because the Second Circuit in Faulkner held that the CNG was a permissible revision, it raised the issue of media neutrality only in passing and only in the context of whether the plaintiffs' contracts explicitly forbade the challenged CNG uses.  . . . [T]he Second Circuit dodged the central issue of whether the CNG was a 'other later collective work' or anthology by declaring microform and microfiche a permissible revision and then analogizing the CNG to microform.  In Greenberg, on the other hand, the Eleventh Circuit undertook the required analysis, determined that the CNG possessed substantial indicia of originality, and emphasized that the Society had admitted as much by registering it with the copyright office as a new compilation.  It then correctly, and consistently with the Second Circuit and Supreme Court Tasini decisions, concluded that the CNG was 'a new product ("an original work of authorship"), in a new medium.'"); Alice Haemmerli, Commentary: Tasini v. New York Times Co., 22 Colum. J. L. & Arts 129 (Winter 1998) (to the same effect).

that a principal component of the underlying policy rationale for finding that the

publisher did not enjoy any § 201(c) privilege was that:

> It would scarcely "preserve the author's copyright in a contribution"
> as contemplated by Congress, [H.R. Rep. at 122], if a newspaper or
> magazine publisher were permitted to reproduce or distribute copies
> of the author's contribution in isolation *or within new collective
> works.*

Tasini, 533 U.S. at 497, 121 S. Ct. at 2389 (citation omitted) (emphasis mine). The

Tasini Court emphasized this copyright policy in protecting the author's (here

photographers') rights by observing:

> The [p]ublishers' encompassing construction of the § 201(c) privilege
> is unacceptable, we conclude, for it would diminish the [a]uthors'
> exclusive rights in the [a]rticles.

Id. With that policy in mind, the Court moved to the actual test to be applied "[i]n

determining whether the [a]rticles have been reproduced and distributed *'as part

of' a 'revision'* of the collective works in issue." Id. (emphasis mine). The Court

stated that it "focus[es] on the [a]rticles as presented to, and perceptible by, the

user of the [d]atabases." Id. at 499, 121 S. Ct. at 2390.

Under this analytical approach, the Court explained:

One might view the articles as parts of a new [aggregation][18] –

_____

[18] The Supreme Court used the word "compendium" here. "Compendium" is defined as:
"1. a brief treatment or account of a subject, esp. an extensive subject; concise treatise; 2. a
summary, epitome, or abridgement; 3. a full list or inventory. *Random House Unabridged
Dictionary* 417 (2d ed. 1987). Presumably, the Court relied upon the third definition. In order to

> namely, the entirety of works in the [d]atabase. In that [aggregation],
> each edition of each periodical represents only a miniscule fraction of
> the ever-expanding [aggregation]. The [aggregation] no more
> constitutes a "revision" of each constituent edition than a 400-page
> novel quoting a sonnet in passing would represent a "revision" of that
> poem. "Revision" denotes a new "version," and a version is, in this
> setting, a "distinct form of something regarded by its creator or others
> as one work. The massive whole of the [aggregation] is not
> recognizable as a new version of its every small part."

Id. at 500, 121 S. Ct. at 2391 (citation omitted). The Court concluded: "Those

[d]atabases [the aggregation] simply cannot bear characterization as a 'revision' of

any *one periodical edition.*" Id. at 501 n.9, 121 S. Ct. at 2391 n.9 (emphasis mine).

A review of the Tasini opinions, both in the Second Circuit and the Supreme

Court, as well as our Greenberg I opinion, discloses that all three opinions cite to

the same House Judiciary Committee Report for interpretation of the last clause of

§ 201(c), the meaning of "revision," and the definition of its scope.[19] The relevant

House Report passage explains:

> The basic presumption of section 201(c) is fully consistent with
> present law and practice, and represents a fair balancing of equities.
> At the same time, the last clause of the subsection, under which the
> privilege of republishing the contribution under certain limited
> circumstances would be presumed, is an essential counterpart of the

---

avoid confusion, because the more favored definitions of the word – emphasizing brevity and conciseness – are inappropriate to the database at issue in our case, reproducing, as it does, the **complete** *National Geographic* with each issue as originally published rather than shortened or summarized in any way, I have instead used the word "aggregation."

[19] Tasini, 206 F.3d at 167; Tasini, 533. U.S. at 495, 121 S. Ct. at 2388; Greenberg I, 244 F.3d at 1273.

> basic presumption. Under the language of this clause a publishing
> company could reprint a contribution from one issue in a later issue of
> its magazine, and could reprint an article from a 1980 edition of an
> encyclopedia in a 1990 revision of it; the publisher could ***not*** revise
> the contribution itself *or include it in a new anthology or an entirely*
> *different magazine or other collective work.*

H.R. Rep. at 122-23 (emphasis mine). Based upon a straight-forward reading of

that legislative history, the two <u>Tasini</u> opinions and our <u>Greenberg I</u> opinion

concluded that § 201(c) does not extend protection for a publisher to include an

author's or photographer's contribution in a collective work in a new aggregation,

<u>Tasini</u>, 533 U.S. at 500, 121 S. Ct. at 2391, or anthology (a "later collective work"

in § 201(c) parlance). <u>Tasini</u>, 206 F.3d at 169; <u>Tasini</u> 533 U.S. at 496-97, 121 S.

Ct. at 2389-90. Under this analysis, Greenberg's copyrights have been infringed.

    If only the Second Circuit had followed its earlier, affirmed approach in

<u>Tasini</u> when it  decided <u>Faulkner</u>, it would have stayed on the correct track. In

stark contrast to the later <u>Faulkner</u> decision, the <u>Tasini</u> Second Circuit panel had

clearly held that: "If the republication is a 'new anthology'[20] or a different

collective work, it is not within Section 201(c)." <u>Id.</u> at 169 (citing H.R. Rep. at

---

[20] "Anthology" is defined as: "[A] collection of literary pieces, such as poems, short
stories, or plays," *The American Heritage Dictionary of the English Language* 114 (2d ed.
1982); or "[a] book or other collection of selected writings by various authors, usually in the
same literary form, of the same period, or on the same subject." The Random House Dictionary
of the English Language 88 (2d ed. 1987). The only reference to "anthology" in the Copyright
Act appears in the § 101 definition of "collective work": "a work, such as a periodical issue,
anthology, or encyclopedia, in which a number of contributions, constituting separate and
independent works in themselves, are assembled into a collective whole."

122-23 (1976)). It should be noted that appellants in their briefs to this court have
attempted to perpetuate an inappropriate and inaccurate analysis originally
introduced by the wrong question by the trial court in the Faulkner case, which is:
"What then distinguishes a 'revision' from an 'entirely different' work?" Faulkner
v. Nat'l Geographic Soc'y, 294 F. Supp. 2d 523, 539 (S. D. N.Y. 2003). The
correct inquiry, reading the plain text of § 201(c) is, rather: "What distinguishes a
'revision' from an 'other collective work?[21]'" The House Report defines it not
solely as an "entirely different work," as Judge Kaplan framed the question, but as
a "new anthology or an entirely different magazine or other collective work." H.R.
Rep. at 122-23. The Faulkner court, using an attenuated microform analogy from
Tasini dicta, avoided the obvious alternate conclusion that the CNG is a new
compendium, anthology, or "other collective work" and not a "revision" under §
201(c).[22] The Society and Mindscape cannot point to any single issue of the some

---

[21] "Collective work" is a copyright term of art defined in Section 101 of the Act. See fn
12 & 14, supra. By that definition, a "collective work" is a species or type of copyrightable
work different from the other two types of copyrightable works; such as, a creative work (like a
novel or drama) and a derivative work (like a motion picture based upon a novel). Thus the
conflation of "work[s]" and generic usage by the Faulkner district judge, and others, distorts the
correct interpretive process.

[22] After publication of both the Tasini opinion and the Faulkner opinion, Professor
Deborah Tussey made the following insightful and pertinent observation:

> The NYTO and GPO CDs, on the other hand, were distributed as
> compilations of original issues, requiring a more extensive inquiry into whether
> they were functional equivalents of revisions or new collective works. Congress,
> in the legislative history, indicated that a publishing company could reprint a

---

contribution from one issue in a later issue of its magazine, and could reprint an article from a 1980 edition of an encyclopedia in a 1990 revision of it, but publishers could not revise the contribution itself or include it in a new anthology or an entirely different magazine or other collective work.  Since GPO included publications other than those taken from the New York Times, it clearly constitutes a new anthology and, hence, a new collective work under section 201(c). NYTO, which accumulated only issues of the New York Times, presents a more difficult case. The Faulkner court read the "entirely different" language to indicate that a collective work which is merely somewhat different from the original is privileged and relies on Tasini dictum regarding microforms to conclude that accumulations of issues of the same periodical are permissible. One can as easily read the passage, standing alone, to indicate that an accumulation of issues, like NYTO, is a new anthology collecting multiple, previous compilations (the individual issues). In the absence of clear direction from Congress, the court should have resolved the question by emphasizing the policy underlying section 201(c).

The legislative history of section 201(c) clearly supports the majority's interpretation of Congress's intent to equalize the balance of power between individual authors and publishers.  The overriding policy issue reflected in that history is fairness in the allocation of incentives for creation, not, as Justice Stevens argues, efficiency of dissemination. The majority offers sufficient empirical evidence to support that policy analysis, based on the impact on the authors' markets for new anthologies. Had the court emphasized this argument and clarified the question whether accumulation of multiple issues was permissible, it might have avoided the result in Faulkner, which undercuts the policy protecting authors. Indeed, the combination of Tasini, Faulkner, and the publishers' new practice of requiring that freelancers license all conceivable rights as a prerequisite to publication, suggests that if Congress retains any interest in protecting powerless freelancers against overreaching publishers, it must devise a better mechanism than section 201(c).

The court would have done well to pursue an alternative argument, urged by the Register of Copyrights, that the critical right infringed in Tasini was the right of public display. The Register argued "vigorously" that the display of individual articles to users violated the authors' right to public display and that since section 201(c) provides publishers no display privilege, the defendants should be held liable.  This approach, had the court taken it, might have avoided the difficulty of defining copies and revisions, and their functional equivalents, in the electronic context. When combined with the policy analysis, it would also have provided a more satisfactory rationale for the result.

Deborah Tussey, Technology Matters: The Courts, Media Neutrality, and New Technologies, 12

49

1,200 separate collective work magazines that bears anything anyone could term a "revision." Each issue of the magazine has been slavishly and identically reproduced and lodged in a different more compact and portable/storable digital medium accompanied by a completely new moving sequence with audiovisual accompaniment (a derivative work), which is displayed on the computer screen and plays each and every time a constituent CD-ROM is booted-up on the computer. Assembled with the unedited/unrevised copies are separately copyrightable computer programs (i.e., the CD Author Development System and the PicTools Development Kit). Recall that the 25-second audiovisual clip consists of 10 different Magazine covers morphing into each other with music and sound effects including Greenberg's "diver" photograph (a contribution or work). This sequence, which is little-discussed in the appellants' many pages of briefs, manifestly infringed upon Greenberg's, and the other contributing photographers', exclusive derivative work rights under § 106(2) by using his work in new ways.

Thus, assuming *arguendo* that the Society can invoke the § 201(c) privilege on behalf of infringing third parties as well as defense of its own conduct, the question becomes: Does the creation of a work that never before existed (the CNG) by combining an exact, unrevised digital replica of 1,200 pre-existing

---

J. Intell. Prop. L. 427, 484-85 (2005).

collective works (i.e., the magazines) together with at least two independently

created and owned copyrightable computer programs into a single integrated

commercial product (the CNG) constitute either: (1) a new anthology; or, (2) other

collective work?  If it is a new anthology or other collective work, then it is

precluded from being privileged under § 201(c) by the express language of H.R.

Rep 94-1476.  See H.R. Rep., supra.  However, the majority at footnote 11 cites a

supplementary report by the Register of Copyrights from 1965 for the inaccurate

and inartful proposition that what Congress really meant in legislative history

which states that a publisher cannot include an author's contribution in a "new

anthology or an entirely different magazine or other collective work" really should

be read as an 'entirely different' collective work." See Maj. Opin. at 16-17.

The majority places great weight upon its comparison of a microform

version of the Magazine pursuant to the putative approval, albeit in dicta, by the

Tasini Court under the § 201(c) privilege of a reproduction of print publications in

microform.  The majority states: "Based on this fidelity to context, the Supreme

Court reasoned that the reproduction of print publications in microform would be

privileged under § 201(c)." Id. at 12.  At the outset of its discussion of the

microform analogy argument by the publishers in Tasini the Court stated:  "The

Publishers press an analogy between the Databases,[23] on the one hand, and microfilm and microfiche, on the other. *We find the analogy wanting.*" <u>Tasini</u>, 533 U.S. at 501, 121 S. Ct. at 2391 (emphasis mine). The majority then proceeds to find the CNG "analogous" to these forms of microform. On the heels of that tenuous "analogy," the majority is dismissive of the addition of the copyrightable computer programs incorporated by Mindscape into the CNG --- the CD Author Development System and the PicTools Development Kit.[24] After describing and lumping together all of these independent and free-standing copyrightable computer programs the majority summarily concludes that: "[T]he computer program's elements . . . do not take the CNG outside the § 201(c) privilege." Maj. Opin. at 19. These copyrightable computer programs are referred to by the majority as "the search function," "zoom capacity," and a "computer program [that] simply compresses and decompresses the digital images." <u>Id.</u> at 19-20. The majority invoking the "a staple of the Copyright Act" – "the principle of media neutrality"[25] – observes that: "The CNG is no different than other CD-ROM

---

[23] Recall that the "GPO" (General Periodicals OnDisc) in <u>Tasini</u>, similar to the CD-ROMs here, were included in the term "Databases."

[24] <u>See</u> Appendix A (Text on CNG boxes of CDs) and Appendix B (shrinkwrapped "License Agreement And Limited Warranty").

[25] Maj. Opin. at 22. This so-called "staple of the Copyright Act" actually appears for the first time in a Supreme Court opinion in <u>Tasini</u>, 533 U.S. 483, 502, 121 S.Ct. 2381, 2392.

products, in that all CD-ROMs *contain* an operating computer program that directs

its functionality;"[26] and, "These added features only serve to provide functionality

to the 'CNG's raison d'etre.'" Id. (emphasis mine).  Confronted with a similar

argument the Supreme Court majority in Tasini stated:  "We lack the dissent's

confidence that the current form of the Databases is entirely attributable to the

nature of the electronic media, rather than the nature of the economic market

served by the Databases.   In any case, we see no grounding in § 201(c) for a

'medium-driven' necessity defense . . . to the Authors' infringement claims."

Tasini, 533 U.S. at 502 n.11, 121 S. Ct. at 2392 n.11.

First and foremost, the majority's analogy of the CNG to microfilm and

microfiche is far too comprehensive.  A valid analogy would be to a reproduction

of the Magazines by scanning them onto a CD-ROM in digital format using the

mechanical operating software embedded in a scanning device — similar to the

---

[26] Maj. Opin. at 19-20.  The statement that "*[a]ll* CD-ROMs contain an operating computer program" is incorrect; CDs are commonly used to store music, data and photograph files without incorporation of any computer program.  It is possible to save pictures, images, songs, or videos onto a CD-ROM without adding a separate computer program to the disk.  As noted above, by using *only* "Windows Explorer®" on a host computer, without a compression or decompression computer program or a search-engine computer program, a user can view each and every page and isolate and copy any photograph on the CD-ROM — thereby destroying any freelance contributors ability to economically benefit from the sale thereof.  Moreover, the appellants use of the JIF (or Jpeg Interchange Format) provides easy, unencumbered access to the individual images of the Magazines on the CNG's constituent CD-ROMs.  So easy that this abacus-age judge could accomplish it with only a little coaching from his law clerks!  Moreover, Professor Patry even refers to me as a "Luddite" in his recent copyright treatise edition.  2 William F. Patry, Patry on Copyright, § 5:142.95 (2007)

photographic microfilming of the pages of a publication. At that point, without the benefit of a compression computer program, one would have essentially a "digital microfilm" stored and capable of display on a computer screen truly analogous to microfilm. The problem for the Society and its co-infringers, however, is that that digital reproduction would likely consume several hundred CDs by assembling it without a compression computer program. Such a reproduction would place the Magazines' images in context, readable and displayable by a computer — but it would not be a marketable product to the present computer-savvy generation, "the economic market served by the [CNG]." Id. The same can be said for the search-engine computer program. Without it the microform-like collection of CDs would not be marketable. Stated differently, the old wine without the new bottles with the twist off cap would be an unmarketable product. The tech-savvy consumer of today would be better off pulling the old editions of the National Geographic Magazine from their parents' and grandparents' closets, basements, or attics and viewing them for free!

The copyright principle in play here is that the nebulous concept of "media neutrality"[27] that has its principal focus on the *owner* of the copyright right, not the

---

[27] Media neutrality means that a copyright *owner* enjoys the same protection in any form where his work is fixed. Stated differently, "media neutrality" conveys the concept that the copyright law should not favor any particular technology over another, such that the subject matter of copyright includes works fixed on both existing media and future media. This broad

*grantee* of a privilege. That concept cannot trump the codified and constitutionally-based rights of a copyright owner. The statutory definition of collective work clearly applies to the "assembly" --- the aggregation --- of distinctly copyrightable works into "a collective whole;" here, the CNG. Thus, when the distinct, separable, copyrightable computer programs (some of which have registered claims of copyright predating the creation of the CNG) have been intentionally incorporated into the commercial product known as the CNG together with the existing components of the collective works — the *unrevised* individual issues of the National Geographic Magazines — there then exists an "other collective work" or surely, even under the majority's (mis)interpretation, "an entirely different collective work" that fails to qualify for inclusion within the § 201(c) privilege.

## B.

The Society claims the benefit of a privilege for a group of third parties that actually compiled and published the CNG. The Society relies on putative transfers

---

protection encourages authors to create more works and thereby advance the progress of science and useful arts. Thus, the purpose of media neutrality is to shape a more flexible copyright law to fit new technology without revising the statutory copyright law in the future. H.R. Rep. at 52. Media neutrality language also appears in a series of statutory definitions (e.g., "audiovisual works," "copies," "fixed," "literary works," "phonorecords" and "sound recordings"). See § 101. However, such language is conspicuously absent from the definitions of "derivative works" and *"compilations."* See § 101. Section 201(c) also lacks media neutrality language. Wendy J. Gordon, <u>Fine-Tuning Tasini: Privileges of Electronic Distribution and Reproduction</u>, 66 Brook. L. Rev. 473, 485 n.65 (2000).

55

to those third-parties of the § 201(c) privilege to insulate it from liability for its contributory infringement and to protect its partners in publication from liability.

Although the issue of the transferability of the privilege accorded under §201(c) was not squarely briefed by the parties,[28] it was identified directly by the Supreme Court in Tasini.[29]  See Tasini, 533 U.S. at 496 n.5, 121 S. Ct. at 2389 n.5. Here, the Society, as the owner of the copyright in the collective works (the Magazines), is the statutory grantee and holder of the privilege.  However, the

---

[28] "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121, 96 S. Ct. 2868, 2877 (1976). Courts have generally been amenable to exercising their inherent power to consider unbriefed *threshold* issues when they arise. See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am. Inc., 508 U.S. 439, 447, 113 S. Ct. 2173, 2178 (1993) ("[A] court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief.") (quoting Arcadia v. Ohio Power Co., 498 U.S. 73, 77, 111 S. Ct. 415, 418 (1990)). Moreover, it is an axiom of appellate review that the judgment of a district court may be affirmed upon any adequate ground, even if it is other than the one on which the court actually relied. See Smith v. Allen, 502 F.3d 1255, 1280 (11th Cir. 2007).

[29] The Society must rely upon the privilege in § 201(c) because it does not hold exclusive right to Greenberg's photographs. Under § 103(b), a copyright in a compilation does *not* extend to the compiler any exclusive rights in the preexisting materials brought together in the collective work. Greenberg's photographs were produced and submitted to the Society *before* the periodicals were published. Therefore, the photographs were preexisting works in which the Society owned no rights at all absent a written transfer. This delineation is further reinforced by the Copyright Office in its Circular 62 on the registration of copyrights in serials, where it states:

> If the serial issue includes any independently authored contributions in which all rights have *not* been transferred by the contributor to the claimant for the serial issue as a whole, those contributions are not included in the claim being registered, because the claimant in these contributions is different from the claimant in the entire serial issue.

Copyright Office Circular No. 62 (Serials) at 4 ("The Claimant and the Extent of the Claim").

56

record reflects that the Society, through taxable subsidiaries, contracted with an unaffiliated third party, Mindscape, to reproduce and distribute the Magazines on CD-ROMs. RAcc#2-230 at 9. Mindscape incorporated two independently owned and copyrighted computer programs (CD Author Development Kit and the PicTools Development Kit owned by DataWare, Inc. and Pegasus Imaging Corporation, respectively) onto each CD-ROM of the CNG.

The question is straightforward: once it has been established who owns the copyright in a particular collective work, who may exercise the § 201(c) privilege? The answer is equally straightforward: the exercise of privilege accorded the owner of a collective work under § 201(c) is limited to that owner. As the Act makes clear, the § 201(c) grant, is a privilege, not a right. As such, it is not transferrable. Thus, as a *threshold* matter, the invocation in this case of the § 201(c) privilege is not authorized by the law on this record.

"Section 201(c) does not and cannot grant rights (since only [§ 106] does that); instead, it provides (rebuttable) presumptive privileges where the owner of a collective work does not have a transfer of exclusive rights from a free-lancer." William F. Patry, Patry on Copyright (hereinafter "Patry") § 5:138 (2007). "Section 201(c) grants specified privileges that can be exercised only by the owner of the original collective work (or an agent acting on behalf of the collective work

owner) and cannot, without free-lancers' permission, be transferred to third parties." Id. Privileges are lesser even than non-exclusive licenses.

> As a result, there can be no doubt that collective owners do not own a transferable copyright ownership interest in freelance authors' separate contributions and that authorization to third parties to include those contributions in an entirely different collective work exceeds the collective work owners' authority under Section 201(c). *Only if the copyright owner in the collective work owns an exclusive right can it authorize third parties to reproduce and distribute freelance authors' separate contributions.*

Patry § 5:141 (emphasis mine).

In the original proceeding in district court in Tasini, the trial judge concluded that any § 201(c) "privilege" was, under §201(d)(2), a "subdivision of any of the rights specified by section 106." Tasini v. New York Times Co., 972 F. Supp. 804, 815-16 (S.D.N.Y. 1997). Thus, he concluded that it could be transferred. Id. However, as noted, "[t]he only 'rights' granted in the Copyright Act are [contained] in Section 106, not in chapter 2." Patry § 5:141 n.2. That the term "privilege," in turn, appears only in § 201(c) shows that Congress recognized a difference between a right and a privilege. Further, "in general law," privileges are "regarded as personal and not transferable."[30] Id.

---

[30] See Chesapeake & Ohio Ry. v Miller, 114 U.S. 176, 186, 5 S. Ct. 813, 818 (1885) (immunity from taxation enjoyed by railroad was a privilege and as such was "personal, and incapable of transfer without express statutory direction," and thus did not pass to purchaser of tract of railroad land); Wilson v. Gaines, 103 U.S. 417, 420-21 (1880) (same); Morgan v. Louisiana, 93 U.S. 217, 223 (1876) (same); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1374 (Fed. Cir. 2004) (fishing permits issued by the government not transferable); FDIC v.

If one examines the pertinent copyright definitions in § 101 and the usage of

"privilege" and "right" throughout the Act, the error of the <u>Tasini</u> district court —

and the appellants here invoking it — becomes clear.  For instance, § 101 defines

copyright ownership and transfer as follows:

> "Copyright owner", with respect to any one of the exclusive rights
> comprised in a copyright, refers to the owner of that particular right.

---

<u>Morrison</u>, 747 F.2d 610, 613-14 (11th Cir. 1984) ("statutory right of redemption" under
mortgage was "a personal privilege, not a transferable property right") (alterations omitted);
<u>United States v. Murdock</u>, 919 F. Supp. 1534, 1541 (D. Utah 1996), <u>aff'd</u>, 132 F.3d 534 (10th
Cir. 1997) (under tribal law principles, "hunting and fishing privilege within the Ute reservation
is a personal right of user, 'neither inheritable nor transferable'");  <u>Herbert v. Newton Mem'l
Hosp.</u>, 933 F. Supp. 1222, 1230-31 (D. N.J. 1996), <u>aff'd</u>, 116 F.3d 468 (3d Cir. 1997) (doctor's
hospital privileges not transferable); <u>Fulton v. United States</u>, 825 F. Supp. 261, 262 (D. Nev.
1993) (grazing permit as to federal lands "is a revocable privilege issued by the government; it is
neither a transferable nor an assignable right").  The Restatement of the Law, Property, is also
helpful on this point, to wit:

> A privilege, as the word is used in this Restatement, is a legal freedom on the part
> of one person as against another to do a given act or a legal freedom not to do a
> given act.
> *Comment*:
>     *a. Correlative absence of right.*  The relation indicated by the word
> "privilege" may also be stated from the point of view of the person against whom
> the privilege exists.  From the point of view of this other person it may be said
> that there is no right on his part that the first person should not engage in the
> particular course of action or of nonaction in question.
> *Illustration:*
>     1. A is the lessee of a farm.  The least contains a covenant with the
> landlord B that A will cultivate field one, and that he will not cultivate field two,
> and has no covenant as to field three.  As between A and B, A has both the duty
> and the privilege of cultivating field one; he has both the duty and the privilege of
> not cultivating field two; except so far as he is affected by the law of waste, he
> has the privilege of cultivating and the privilege of not cultivating field three.

Restatement (First) of Property § 2 (1936).

59

> A "transfer of copyright ownership" is an assignment, mortgage,
> exclusive license, or any other conveyance, alienation, or
> hypothecation of a copyright or of any of the exclusive rights
> comprised in a copyright, whether or not it is limited in time or place
> of effect, but not including a nonexclusive license.

§ 101. As noted, "ownership" and "transfer" thereof are addressed only in the

context of the § 106 "exclusive rights." Nowhere is either of these terms used in

connection with a "privilege." Incidentally, the forms of transfer mentioned in the

above definition and in § 201(d)(1)[31] are familiar forms of property transfer. Just

as with most property transfers, any interest in copyright that is *transferable* must

be accomplished in a writing, to wit:

> § 204. Execution of transfers of copyright ownership
> (a) A transfer of copyright ownership, other than by operation of law,
> is not valid unless an instrument of conveyance, or a note or
> memorandum of the transfer, is in *writing* and *signed by the owner* of
> the rights conveyed or such owner's duly authorized agent.

§ 204 (emphasis mine). Again, only an "owner" may effect a transfer. Thus, it is

---

[31]      § 201. Ownership of copyright
                *      *      *
         (d) Transfer of Ownership.–
              (1) The ownership of a copyright may be transferred in
         whole or in part by any means of conveyance or by operation of
         law, and may be bequeathed by will or pass as personal property
         by the applicable laws of intestate succession.
              (2) Any of the exclusive rights comprised in a copyright,
         including any subdivision of any of the rights specified by section
         106, may be transferred as provided by clause (1) and owned
         separately. The owner of any particular exclusive right is entitled,
         to the extent of that right, to all of the protection and remedies
         accorded to the copyright owner by this title.

important and significant that under § 201(c) "the *owner* of copyright in a collective work," not a transferee or sub-grantee, is specified as having:

> **only** the *privilege* of *reproducing* and *distributing* the contribution [for which copyright ownership is vested in the author] **as part of** that particular collective work [for which copyright ownership is vested in the publisher], **any revision of that collective work**, and any later collective work in the same series.

§ 201(c) (emphasis mine). A clear distinction is drawn between the "owner" of the contribution and the "owner" of the particular collective work — the ***only person privileged*** to reproduce and distribute said contribution.

Here we have a publisher, the Society (a not-for-profit corporation), allegedly transferring its "revision" privilege(s) to a wholly-owned, for-profit corporation, which then putatively re-transfers the "revision" privilege(s) to Mindscape, Inc. in order to exploit the contributor's independently copyrighted work in a manner never intended by § 201(c).[32] However, as emphasized, the limited §201(c) "privilege" cannot be exercised by anyone other than the "owner of the [original] collective work" — here the Society.

This limitation as to any transfer of the § 201(c) privilege gains further support through a study of other uses of "privilege" in the Act. If a particular word of a section of a statute is not otherwise expressly defined, that word's use

---

[32] See notes 1 &17, supra.

61

elsewhere in the statute is indicative of how that word should be interpreted within the section itself. See Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 333, 114 S. Ct. 843, 845 (1994) (requiring courts to give words which are used in more than one place in a statute interpretations that are consistent). The word "privilege" appears only three times in the entire 1976 Copyright Act: in § 201(c), and in §§ 109(d) and 111(d). Section 109(d) provides that persons *other* than the two express recipients (buyers and libraries) of the "privileges" described therein *cannot* exercise those privileges:

> (d) The privileges prescribed by subsections (a) and (c) do *not*, unless authorized by the copyright owner, extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it.

§ 109(d) (emphasis mine). That is, the § 109(d) "privileges," as exceptions to the § 106 rights, are given by express statutory language only to buyers of copyrighted works and to libraries. Such privileges do not extend to third parties, such as non-owners or library patrons who merely borrowed or rented the works unless "authorized by the copyright owner." Id. Similarly, § 111(d)(1)(B)(i) defines the consideration (a compulsory licensing fee) that cable systems must pay for the "privilege" of retransmitting television broadcasts. Once paid for, the privilege is particular to the cable system in question. § 111(d)(1)(B)(i).

Interpreting "privilege" in § 201(c) in accordance with that term's use in §§ 109(d) and 111(d), clarifies that the § 201(c) privileges cannot be transferred to the subs, NGE/National Geographic Interactive and Mindscape, Inc.  The contributing owner (here Greenberg) never authorized the transfer.  Like the privileges provided for in § 109(d) and § 111(d), the express limitations on the privilege in § 201(c) exist in the statutory language itself.  Only the "owner of the copyright in that collective work" (here each Magazine) has the authority to exercise any of the § 201(c) privileges.

The legislative history of the 1976 Copyright Act also informs the non-transferability of privileges.  The 1961 draft stated:

> The copyright secured by the publisher in the composite work as a whole should cover all of the contributions not separately copyrighted; but the publisher should be deemed to hold in trust for the author all *rights* in the author's contribution, except the *right* to publish it in a similar composite work and any other *rights* expressly assigned.

Register of Copyrights for the H. Comm. on the Judiciary, 88th Cong., Copyright Law Revision Part 2, 230 (Comm. Print. 1963) (emphasis mine).  In stark contrast, a 1964 draft stated:

> The owner of copyright in the collective work shall, in the absence of an express transfer of the copyright or of any exclusive *rights* [of the author] under it, be presumed to have acquired only the *privilege* of publishing the contribution in that particular collective work.

63

Staff of H. Comm. on the Judiciary, 88th Cong., Copyright Law Revision Part 3, 15 (Comm. Print 1964) (emphasis mine). In addition to demonstrating that a statutory privilege is personal to the statutorily defined recipient thereof, the drafts of § 201(c) demonstrate that the privileges were not meant to be transferable. The change in language from "right" (in the 1961 draft) to "privilege" (in the 1964 draft) confirms the drafters' intent to provide publishers with something less than a right — a mere privilege that was *not* transferable.

The subject matter of § 201 is "copyright ownership and transfer." Throughout the section, the words "right" and "copyright" are used in connection with authors or their surrogates (employers for hire). In that section, the only time the word "privilege" is used at all in is connection with publishers. § 201 <u>et seq.</u> This usage reveals an intent to limit a publisher's entitlements. If Congress had wanted to give publishers a "right" to transfer authors' contributions to third parties, the word "privilege" would not have been substituted for the word "right" in § 201(c). Congress required "express transfers" in the "works-made-for-hire" and "transfer of ownership of copyright"definitions in §§ 101 and 204. Section 201(c), however, is premised on the *non-existence* of an "express transfer of the copyright or of any rights under it." § 201(c). Accordingly, Congress intended the word "privilege" to be less than a right and non-transferable, analogous to a

64

nonexclusive license.

For all of these reasons, it should be clear that the "privilege" of § 201(c) is not transferable but resides only with the copyright owner of the collective work — here the Society.   Accordingly, only the Society may claim shelter from infringement under § 201(c) and then only if it exercised the two specific privileges in the manner permitted — which it did not.

C.

Another determinative issue has been ignored by the appellants and omitted from consideration by the majority — the "public display" issue.  Simply stated, if indeed the appellants enjoy a § 201(c) privilege it does not include the privilege of publicly displaying Greenberg's protected photographs.

The Court in <u>Tasini</u>, 533 U.S. at 498 n.8, 121 S. Ct. at 2390 n.8, expressly stated that it did not reach the display issue.  Appellants are relying upon the *privilege* they contend that the Society has ***solely*** under § 201(c).[33]  Section 201(c)

---

[33] In the appellants' *en banc* brief, at page 6, under "STATEMENT OF THE ISSUE," they state the following:

> In its Order of September 19, 2007, the *en banc* Court directed the parties to address the following issue:

>> Is Greenberg entitled to copyright protection for the subject work subsequent to the United States Supreme Court's decision in *New York Times Co. v. Tasini*, 433 U.S. 483 (2001)?

> The corollary question is:

provides:

> In the absence of an express transfer of the copyright or
> of any rights under it, the owner of copyright in the
> collective work is presumed to have acquired *only the*
> *privilege of **reproducing** and **distributing** the*
> *contribution **as part of that particular collective work**,*
> any revision of that collective work, and any later
> collective work in the same series.

(emphasis mine) ("contribution" in this case refers to the photographs contributed

by Greenberg who has undisputed ownership of the copyrights for the photographs

that appear in the CNG product.).

As the Court observed in Tasini, "[t]he 1976 Act rejected the doctrine of

indivisibility, recasting the copyright as a bundle of discreet "exclusive rights,"

each of which "may be transferred . . . and owned separately." Id. at 495-96, 121

S. Ct. at 2388-89 (citations omitted).  The Tasini Court, in its fourth footnote,

---

> Whether, in light of the Supreme Court's decision in *Tasini*,
> National Geographic is entitled to the privilege of 17 U.S.C. §
> 201(c) when it reproduced Greenberg's photographs as part of *an*
> *exact digital replica of the entire National Geographic magazine*
> *series*, within which those photographs first appeared in print?
>
> As a general matter, the answer to the first question is yes.  Greenberg
> retains his copyright protection for his individual works.  Those copyrights,
> however, have not been infringed in this case because National Geographic, as the
> owner of the collective work copyright, is entitled to reproduce Greenberg's
> pictures in the CNG by virtue of § 201(c).

(Emphasis mine).

66

quotes the § 106 rights, including subpart "(5)" which reads:

> (5) in the case of literary, musical, dramatic, and choreographic
> works, pantomimes, and *pictorial*, graphic, or sculptural works,
> including the individual images of a motion picture or other
> audiovisual work, *to **display** the copyrighted work publicly;*

Id. at 496 n.4, 121 S. Ct. at 2389 n.4; § 106(5) (emphasis mine).  An examination

of the other five descriptions of copyright rights disclose the following verb forms

with each enumeration: "(1) to *reproduce*; (2) to *prepare* derivative works; (3) to

*distribute* copies; (4) . . . to *perform*; . . . (6) . . . to *perform* . . . publicly by means

of a digital audio transmission."  Id. (emphasis mine).

Accordingly, a comparison between § 201(c) and § 106(1)-(6) discloses that

the § 201(c) "privilege" is confined only to two of the copyright owner's exclusive

rights:  that is, "(1) to reproduce" and "(3) to distribute copies."  Nowhere is the

right under § 106(5), the right to "display" a pictorial work, mentioned or included.

Expressio unis est exclusio alterius.

Moreover, when one examines § 101, where the statutory definitions are set

out, one discovers that "display" has a definition that includes projection on a

computer screen -- which is exactly what takes place when a CNG CD-ROM is

inserted into the computer of a user:

> To "display" a work means to show a copy of it, either directly or by
> means of a film, slide, television image, or any other device or process
> or, in the case of a motion picture or other *audiovisual work*, to show

individual images nonsequentially.

§ 101 (emphasis mine). The statutory definition of "audiovisual work" under §

101, further clarifies the computerized "display":

> "Audiovisual works" are works that consist of a series of related images which are *intrinsically intended to be shown by the use of* machines, or devices such as projectors, viewers, or *electronic equipment*, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

Id. (emphasis mine).

As observed above, the <u>Tasini</u> Court, at footnote 8, squarely raised the "publicly display" issue. Such an issue presents itself in the resolution of the scope of the § 201(c) privilege once we get past the initial hurdle of "context." In the very document cited by the Court, the "letter" of the Register of Copyrights, Marybeth Peters, a recognized copyright scholar, states:

> The limited privilege in § 201(c) does not authorize publishers to display authors' contributions publicly, either in their original collective works or in any subsequent permitted versions. It refers only to "the privilege of reproducing and distributing the contribution." Thus, the plain language of the statute does not permit an interpretation that would permit a publisher to display or authorize the display of the contribution to the public.
>
> . . . The other databases involved in the case, which are distributed on CD-ROMs, also (but not always) involve the public display of the works. Because the industry appears to be moving in the direction of a networked environment, CD-ROM distribution is likely to become a less significant means of disseminating information.

The Copyright Act defines "display" of a work as showing a copy of a work either directly or by means of "any other device or process." The databases involved in Tasini clearly involve the display of the authors' works, which are shown to subscribers by means of devices (computers and monitors).

To display a work "publicly" is to display "to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." . . .

This conclusion is supported by the legislative history. The House Judiciary Committee Report at the time § 203 was finalized referred to "sounds or images stored in an information system and capable of being performed or displayed at the initiative of individual members of the public" as being the type of "public" transmission Congress had in mind.

When Congress established the new public display right in the 1976 Act, it was aware that the display of works over information networks could displace traditional means of reproduction and delivery of copies. The 1965 Supplementary Report of the Register of Copyrights, a key part of the legislative history of the 1976 Act, reported on "the enormous potential importance of showing, rather than distributing copies as a means of disseminating an author's work" and "the implications of information storage and retrieval devices; when linked together by communications satellites or other means," they "could eventually provide libraries and individuals throughout the world with access to a single copy of a work by transmission of electronic images." It concluded that in certain areas at least, "'exhibition' may take over from 'reproduction' of 'copies' as the means of presenting authors' works to the public." The Report also stated that "in the future, textual or notated works (books, articles, the text of the dialogue and stage directions of a play or pantomime, the notated score of a musical or choreographic composition etc.) may well be given wide public dissemination by exhibition on mass communications devices."

69

When Congress followed the Register's advice and created a new display right, it specifically considered and rejected a proposal by publishers to merge the display right with the reproduction right, notwithstanding its recognition that "in the future electronic images may take the place of printed copies in some situations." H.R. Rep. No. 89-2237, at 55 (1966).

Thus, § 201(c) cannot be read as permitting publishers to make or authorize the making of public displays of contributions to collective works. Section 201(c) cannot be read as authorizing the conduct at the heart of Tasini.

The publishers in Tasini assert that because the copyright law is "media-neutral," the § 201(c) privilege necessarily requires that they be permitted to disseminate the authors' articles in an electronic environment. This focus on the "media-neutrality" of the Act is misplaced. Although the Act is in many respects media-neutral, e.g., in its definition of "copies" in terms of "any method now known or later developed" and in § 102's provision that copyright protection subsists in works of authorship fixed in "any tangible medium of expression," the fact remains that the Act enumerates several separate rights of copyright owners, and the public display right is independent of the reproduction and distribution rights. The media-neutral aspects of the Act do not somehow merge the separate exclusive rights of the author.

147 Cong. Rec. E182-02 (2001) (Letter from Marybeth Peters, The Register of Copyrights of the United States of America, to Representative James P. McGovern, United States House of Representatives (Feb. 14, 2001)).

Clearly, users of the CNG CD-ROMs use their computers by virtue of operating code ("a process") at different "times" and "places." A House Judiciary Committee report states: "In addition to the direct showings of a copy of the work

70

[here photograph], 'display' would include the projection of an image on a screen .

. . by any method, the transmission of an image by electronic or other means, and

the showing of an image on a cathode ray tube, or similar viewing apparatus

connected with any sort of information storage and retrieval system." H.R. Rep.

No. 94-1476, *reprinted in* 17 U.S.C.A. § 106 (West 2005). Thus, a computer

image of the photograph(s) at issue would clearly constitute a "display." The

report continues that: "The definition of 'transmit' . . . is broad enough to include

all conceivable forms and combinations of wired and wireless communications

media . . . ." That would certainly include a CD-ROM that is sold to the public at

large, to schools, to libraries, and to other downstream "displayers" for that very

purpose.

This interpretation is consistent with the judicial and academic interpretation

of that section. See, e.g., Perfect 10, Inc. v. Amazon.com, Inc., 487 F.3d 701, 716

(9th Cir. 2007) ("In sum, based on the plain language of the statute, a person

displays a photographic image by using a computer to fill a computer screen with a

copy of the photographic image fixed in the computer's memory."); ALS Scan,

Inc. v. RemarQ Cmtys., Inc., 239 F.3d 619, 622-26 (4th Cir. 2001) (observing that

website display of copyrighted photographs to internet subscribers was "public

display"); see generally R. Anthony Reese, The Public Display Right: The

71

Copyright Act's Neglected Solution to the Controversy over RAM "Copies", 2001 U. Ill. L. Rev. 83. (2001); David Nimmer, Nimmer on Copyright § 8.20 (2007).

Finally, I will address the amici's histrionic speculation and contention that a decision in favor of Greenberg would lead to the wholesale purging of their electronic archives (information-destroying purges, loss of recorded history, massive destruction of constitutionally protected information, etc.). See generally Amici Briefs. This often-repeated but seldom-analyzed threat is totally specious. Archives, under a narrow construction of § 201(c) are not an unauthorized "reproduction and distribution" because they are not "distributed." See § 108 ("Limitations on exclusive rights:  Reproduction by libraries and archives"). Section 201(c) is aimed at protecting authors in the context of works reproduced and distributed to the public.[34] If archives are maintained primarily as a set of records, they are unaffected by the holdings in Tasini and Greenberg I. One must distinguish, however, between history being available to the public in archives, and history as a consumer product sold to the public in mass-merchandised CD-ROMs

---

[34] The term "distributed" has a very specific meaning in copyright law. The statutory definition of "distribution" specifies distribution of "copies or phonorecords of the copyrighted work *to the pubic* by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 106(3) (emphasis mine). Archives maintained by media companies may be visited by researchers  (physically or virtually) without thereby being offered to the public by any of the means specified in §106. Nor would they be distributed in the sense of being "published." See the definition in § 101 of "publication," its relationship to distribution, and the differentiation of "public display" from "publication" as a form of distribution.

or databases.  If publication is limited to the former, history need not be lost (or even inconveniently stored); it just will not be a profitable commodity – as the publishers here have endeavored to make it.

Moreover, even if such archives were technically not protected by § 201(c), their inclusion of authors' contributions would generally qualify as a fair use.[35] Because the contributions would not be made widely available to the general public but would, rather, be included in records utilized primarily by researchers and scholars, there would be little or no impact on the market for the authors' contributions.  Therefore, it is specious to assert that the purging of archives must occur based upon an adverse ruling to the publishers.  Thus, the doomsday cries of a "loss of history" appear at best hyperbolic, and at worst, disingenuous.

The majority rationale, essentially adopting that of Faulkner, should be

---

[35] See § 107 (fair use is permitted for purposes of scholarship, criticism, and teaching, among other things).  Under the statute, a purported fair use is analyzed on the basis of factors including, but not limited to, (1) "the purpose and character of the use"; (2) "the nature of the copyrighted work"; (3) the amount of the work used in relation to the copyrighted work as a whole; and (4) "the effect of the use upon the potential market for or value of the copyrighted work."  Id.  Although factors (2) and (3) would favor the authors (whose work is creative and reproduced in toto), factor (1), insofar as the archival use is noncommercial and for the purpose of recording the article for posterity, would just as likely favor the archivist despite reproducing the article unchanged.  As for factor (4), it would not appear that access to archives would adversely affect the value of the contributions to collective works.  In addition, one can make other arguments in favor of public access to archives on the basis of the public interest in being fully informed.  See, e.g., Time Inc. v. Bernard Geis Assocs., 293 F.Supp. 130, 146 (D.N.Y. 1968) (ostensibly using a fair use rationale to permit publication of drawings derived from copyrighted photographs of the Kennedy assassination, but also stating that "[t]here is a public interest in having the fullest information available on the murder of President Kennedy.").

73

rejected and the district court's judgment should be affirmed on the basis of the rationales set out above.

ANDERSON, Circuit Judge, dissenting, in which EDMONDSON, Chief Judge, TJOFLAT, BIRCH, and WILSON, Circuit Judges, join:

Respectfully, I disagree with the majority. I agree with and join Part A of Judge Birch's dissent,[1] but I write separately to emphasize a few points.

## A.

Section 201(c) emphasizes that the "[c]opyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution." 17 U.S.C. §201(c). The section goes on to explain that "the owner of copyright in the collective work is presumed to have acquired <u>only</u> the privilege of reproducing and distributing the contribution as part of [1] that particular collective work, [2] any revision of that collective work, and [3] any later collective work in the same series." <u>Id.</u> (emphasis added). Congress limited the privilege of reproduction and distribution so that publishers could not "revise the contribution itself or include it in a new anthology or an entirely different magazine or other collective work" without the author's consent. <u>N.Y. Times Co. v. Tasini</u>, 533 U.S. 483, 497, 121 S. Ct. 2381, 2389 (2001) (quoting H.R. Rep. No. 94-1476, at 122-23 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5738).

---

[1] Because Judge Birch's Part A would be dispositive of the en banc issue, I need not address Parts B and C of Judge Birch's opinion.

In the present case, Greenberg and the other freelancers allowed their separate contributions – i.e., certain photos in the case of Greenberg – to be included in specific collective works – i.e., individual issues of National Geographic magazine. Years later, National Geographic republished the individual contributions, within their original context but combined with other magazine issues, in "The Complete National Geographic" ("the CNG"), and we must decide whether the CNG is a privileged "revision" of the individual issues, as the majority concludes, or instead, an unprivileged "new anthology or . . . entirely different magazine or other collective work." Although this admittedly is a close question, for the reasons explained in Part A of Judge Birch's dissent, and for the reasons set out below, I conclude that the CNG constitutes the latter.

At the outset, my resolution of this question differs from the majority's because in my judgment, the contextual analysis set forth in Tasini does not fully resolve the instant case. It is true, of course, that the Tasini Court's analysis definitively resolved the case before it. In Tasini, the republished newspaper and magazine articles at issue did not appear in context, and therefore the contextual analysis was decisive – i.e., the new publication was not privileged under §201(c). 533 U.S. at 500, 121 S. Ct. at 2391. On the other hand, because individual articles in the CNG appear in their original context, and because users may "flip" through

76

pages as they could with the original magazines, the re-publication of Greenberg's photos satisfies the threshold contextual analysis. Nonetheless, this case presents an issue not addressed, and not answered, in <u>Tasini</u> – i.e., does satisfaction of the contextual analysis <u>always</u> mean that the new publication enjoys the §201(c) privilege?

As a matter of common sense, it seems clear to me that the answer to that question is: No. For example, suppose the March 2000 monthly edition of National Geographic had been devoted entirely to the geography and natural beauty of Africa; later, National Geographic included that March 2000 edition as a chapter in a larger book entitled "The Complete Intellectual History of Africa from 1900 to 2008," which purported to describe the historical development of every aspect of African life – including <u>inter alia</u> (and in addition to the chapter comprising the March 2000 edition on geography and natural beauty) the literature, philosophy, music, and legal and economic aspects of African society. Of course, my example is attempting to describe a work so entirely different in format, purpose, and utility that everyone would agree that it would qualify as "an entirely different collective work"; i.e., everyone would agree that it is not privileged. Because the individual contributions comprising the March 2000 edition in my example are reproduced in context, and yet the new book would still constitute an

77

entirely different collective work, it thus seems clear to me that <u>Tasini</u>'s contextual

analysis is merely a threshold issue.

Notwithstanding the fact that this threshold is satisfied in this case, the

crucial issue remains whether the CNG is a "revision of that collective work" (to

which National Geographic's privilege would extend), or whether it is "an entirely

different . . . or other collective work" (to which the privilege would not extend).

Several aspects of the CNG convince me that it constitutes the latter, thus

exceeding the publisher's §201(c) privilege.

### B.

First, there is considerable doubt that §201(c) by itself confers upon National

Geographic the privilege of reproducing the individual contributions, even in their

original context, within the cumulative total of all National Geographic magazines.

That is, putting aside the CD-ROM format of the CNG and its added features, I

doubt that §201(c) permits the publisher to bind together every single issue of

National Geographic magazine and sell the compilation as one comprehensive

(albeit unwieldy) volume without compensating the individual contributors or

obtaining their consent.[2]   Section 201(c) permits National Geographic to distribute

---

[2] Of course, National Geographic could secure the right to republish the individual contributions through contract, but National Geographic has asserted no such agreement here. Instead, the extent of the rights National Geographic claims by virtue of contract is the right to republish the individual contributions by virtue of §201(c)'s limited privilege.

78

Greenberg's photo as part of a particular collective work – a single issue of the magazine – or as a part of a revision of that magazine, but surely the compilation of all National Geographic issues does not constitute a "revision" of any single issue.[3] After all, the <u>Tasini</u> Court noted that placing all the articles from one edition of the New York Times into a CD-ROM database along with all the articles from other editions of that paper, does not constitute a revision of each edition: "The Database no more constitutes a 'revision' of each constituent edition than a 400-page novel quoting a sonnet in passing would represent a 'revision' of that poem." 533 U.S. at 500, 121 S. Ct. at 2391. This explanation comports with the Second Circuit's explanation that the database of New York Times articles is "at best a new anthology of innumerable editions of the Times, and at worst a new anthology of innumerable articles from these editions," and thus "cannot be said to be a 'revision' of any (or all) particular editions." <u>Tasini v. N.Y. Times Co., Inc.</u>, 206 F.3d 161, 169 (2d Cir. 2000). The point is, according to the Supreme Court, that "[t]he massive whole of the Database is not recognizable as a new version of its every small part." <u>Tasini</u>, 533 U.S. at 500, 121 S. Ct. at 2391. Similarly, the massive whole of the CNG is not recognizable as a new version of the individual magazines in which Greenberg's photos originally appeared. Notwithstanding the

---

[3] I need not decide whether such a compilation is a "later work in the same series," because National Geographic has disavowed reliance on that prong of §201(c).

79

fact that Greenberg's photographs appear in their original context, the CNG remains at best a new anthology of the many editions of National Geographic. Publishing Greenberg's photos in such a new anthology (or "other collective work") exceeds the limited privilege Congress established in §201(c).

The mere fact that in dicta in Tasini the Supreme Court distinguished the at-issue databases from microfilm and microfiche does not indicate, as the majority seems to believe, that microforms, which often collect multiple editions of a particular newspaper or magazine, constitute a privileged "revision" of each individual edition. The Tasini Court merely rejected a comparison between the databases and microforms because the databases, unlike microforms, failed the threshold requirement that the article may only be distributed in its original context. See 533 U.S. at 501-02, 121 S. Ct. at 2391092.[4]

Admittedly, microfilm and microfiche are longstanding means of publishing collective works. Assuming that the publisher of a collective work does not infringe the separate copyrights held by individual contributors when the publisher sells microforms containing multiple editions of the collective work, I suggest that

---

[4] The publishers in Tasini had urged the comparison to microform under the assumption that microform falls within the §201(c) privilege, see Tasini Supreme Court Br. for Pet'rs, 2001 WL 27573, at 45 (claiming, without citation of any authority, that the Second Circuit's Tasini opinion "cannot possibly be correct, because it would deem microfilm and microfiche to be infringing").

the reason is more likely a contract reason, coupled with the doctrine of media neutrality, as opposed to a §201(c) privilege. Fortunately, we need not decide whether publishers' sales of such microforms fall within the privilege granted by §201(c), or are otherwise protected under the Copyright Act, because the issue is not before us, just as it was not before the Tasini Court. At no point in Tasini did the Supreme Court actually hold that microform copies of multiple editions qualify for the §201(c) privilege. As such, although the CNG, like microforms, passes the threshold contextual requirement, this fact does not end the analysis of whether publishers may, pursuant to §201(c), distribute a collective work that is combined with other collective works.

Furthermore, even assuming that microform reproductions enjoy the §201(c) privilege, the CNG contains significant differences from microforms that bolster my opinion that the CNG is a new anthology or an entirely different other collective work. As Judge Birch ably explains in his dissent, the CNG's advanced search function, compression/decompression program, and its digital format are relevant to deciding whether the CNG constitutes an unprivileged new collective work. Greenberg granted the right to include his pictures in several single monthly editions. National Geographic claims in this case that its rights to the several monthly magazines for casual reading is extended by virtue of §201(c) to the right

81

to publish an entirely new product – a sophisticated research tool capable of readily accessing and isolating any article or subject matter that had been published in National Geographic magazines for over 100 years – thus appealing to a new market. I do not believe that §201(c) can encompass the magnitude of the changes wrought here. Although the mere conversion from print to digital media, the addition of new functionality, and/or the inclusion of other independently copyrightable material *may* not always result in the creation of an entirely different collective work, when National Geographic combined roughly 1,200 issues of a magazine into a new product in a new format with these new features and these new uses, the publisher has created a new collective work that exceeds its §201(c) privilege. Assuming arguendo that the doctrine of media neutrality has some operation in the context of a §201(c) privilege – as opposed to the usual context of the copyright owner of the underlying articles – I doubt that the doctrine should operate with such full force in this context as to nullify the significant changes and assemblage wrought in this new product.

Finally, the fact that the Supreme Court in Tasini held that the §201(c) privilege did not extend to the publication referred to as GPO provides strong support for my position, and that of Judge Birch, that the §201(c) privilege also does not extend to the CNG. Recall that the GPO "show[s] each article exactly as

82

it appeared on [the original] printed pages, complete with photographs, captions, advertisements, and other surrounding materials." 533 U.S. at 491, 121 S. Ct. at 2386. The difference between the GPO and the CNG is that the user of the former may not flip from one article to another, whereas the CNG user can. As a matter of common sense and common experience, that is not a difference that would make a difference to the user, or to the publisher whose interest is marketing the new product. The existence <u>vel non</u> of the flip feature is similarly irrelevant to the authors of the individual articles. The value of Greenberg's copyright is undermined in a manner comparable to that of the individual authors in the GPO. "It would scarcely preserve the author's copyright in a contribution, as contemplated by Congress . . . if a newspaper or magazine publisher were permitted to reproduce or distribute copies of the author's contribution in isolation or within new collective works." <u>Tasini</u>, 533 U.S. at 497, 121 S. Ct. at 2389 (internal quotation from the House Report omitted). Like the GPO, the CNG is a new product, appealing to a new market.

For the foregoing reasons, and for the reasons expressed by Part A of Judge Birch's dissent, I respectfully dissent.[5]

---

[5] As the Court in <u>Tasini</u> noted, "it hardly follows" from my position that an injunction should issue. 533 U.S. at 505, 121 S. Ct. at 2393 (suggesting that courts "may draw on numerous models for . . . remunerating authors"). In my judgment, the circumstances of a case like this call for care on the part of trial courts to ensure that a hold-out freelancer does not

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

exercise either veto power or blackmail power.

84

## MINIMUM SYSTEM REQUIREMENTS

**WINDOWS® 95 OR WINDOWS® 3.1 CD**

- 80486DX 33 MHz processor
- Windows 3.1x running under DOS 6.0 or higher or Windows 95 Version 1
- 8 MB RAM
- 10 MB free disk space
- VESA Standard VGA
- 640 x 480 resolution x 256 colors
- Windows compatible sound card
- Dual-speed CD-ROM

Optional: printer (300 dpi or higher)

**MACINTOSH® CD**

- 68030 33 MHz processor
- System 7.5 or higher
- 8 MB RAM
- 10 MB free disk space
- 640 x 480 resolution x 256 colors
- Dual-speed CD-ROM

Optional: printer (300 dpi or higher)

ISBN 0-7911-2671-4

0  24294 12671  0

©1997 National Geographic Society. All rights reserved. Produced by National Geographic Interactive, Washington, D.C. 20036. Distributed by Mindscape, Inc. NATIONAL GEOGRAPHIC and the Yellow Border Design are registered trademarks ® of National Geographic Society. Marcas Registradas. Mindscape is a registered trademark and the Mindscape logo is a trademark of Mindscape, Inc. Kodak, Kodak corporate symbol and Take Pictures. Further. are trademarks of Eastman Kodak Company. Windows is a registered trademark of Microsoft Corp. Macintosh, QuickTime, and the QuickTime logo are registered trademarks of Apple Computer, Inc. used under license. © 1997 AT&T Corporation. All Rights Reserved. AT&T WorldNet is a service mark of AT&T Corporation. The Complete NATIONAL GEOGRAPHIC on CD-ROM was produced from an archive of magazines collected in a central repository and is not representative of any single regional edition of NATIONAL GEOGRAPHIC magazine. All other trademarks and registered trademarks are the property of their respective holders.

Made from renewable resources.

**USE OF THIS PRODUCT IS SUBJECT TO THE LICENSE AGREEMENT AND LIMITED WARRANTY CONTAINED IN THIS PACKAGE.**

APPENDIX A

# IMPORTANT – READ CAREFULLY BEFORE USING THIS PRODUCT
## LICENSE AGREEMENT AND LIMITED WARRANTY

BY USING THE SOFTWARE INCLUDED WITH THIS AGREEMENT ("PROGRAM") YOU ACCEPT THE TERMS OF THIS LICENSE WITH MINDSCAPE, INC. ("MINDSCAPE"). IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, AND YOU ARE ALSO THE ORIGINAL PURCHASER OF THIS PROGRAM LICENSE ("ORIGINAL PURCHASER"), PROMPTLY RETURN THE SOFTWARE TOGETHER WITH ALL ACCOMPANYING ITEMS TO YOUR DEALER FOR A FULL REFUND.

LIMITED USE LICENSE. Mindscape and its suppliers grant you the right to use one copy of the Program for your personal use only. All rights not expressly granted are reserved by Mindscape or its suppliers. You must treat the Program and associated materials and any elements thereof like any other copyrighted material (e.g., a book or musical recording). This Agreement is governed by the internal substantive laws of the State of California.

YOU MAY NOT: • Use the Program, or permit use of the program, on more than one computer, computer terminal, or workstation at the same time.

• Make copies of the materials accompanying the Program, or make copies of the Program or any part thereof.

• Except as permitted by the Program, copy the Program onto a hard drive or other device and you must run the Program from the CD-ROM (although the Program itself may copy a portion of the Program onto your hard drive during installation in order to run more efficiently).

• Use the Program, or permit use of the Program, in a network or other multi-user arrangement or on an electronic bulletin board system or other remote access arrangement.

• Rent, lease, license or otherwise transfer this Program without the express written consent of Mindscape, except that you may transfer the complete Program copy and accompanying materials on a permanent basis, provided that no copies are retained and the recipient agrees to the terms of this Agreement.

• Reverse engineer, decompile, disassemble, or create derivative works of, the Program.

• Publicly perform or publicly display this program.

LIMITED WARRANTY. Mindscape warrants to the Original Purchaser only, that the Program shall perform substantially in accordance with the accompanying written materials for ninety (90) days from the date of purchase.

EXCLUSIVE REMEDY. The Original Purchaser's exclusive remedy for the breach of this license shall be, at Mindscape's option, either (a) the repair or replacement of the Program that does not meet Mindscape's Limited Warranty and which is returned to Mindscape with a copy of your receipt; or (b) a refund of the price, if any, which you paid for the Program and associated materials. This Limited Warranty is void if the failure of the Program has resulted from accident, abuse, misapplication, or use of the Program with incompatible hardware.

NO OTHER WARRANTIES. MINDSCAPE AND ITS SUPPLIERS, IF ANY, DISCLAIM ALL WARRANTIES WITH RESPECT TO THE PROGRAM AND ACCOMPANYING MATERIALS, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, AND FITNESS FOR A PARTICULAR PURPOSE. THIS LIMITED WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS. DEPENDING UPON WHERE YOU LIVE, YOU MAY HAVE OTHER RIGHTS, WHICH VARY FROM STATE/COUNTRY TO STATE/COUNTRY.

LIMITATIONS ON DAMAGES. IN NO EVENT SHALL MINDSCAPE OR ITS SUPPLIERS, IF ANY, BE LIABLE FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES WHATSOEVER ARISING OUT OF THE USE OF OR INABILITY TO USE THE PROGRAM OR PROGRAM PACKAGE, EVEN IF MINDSCAPE OR ITS SUPPLIERS, IF ANY, HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. MINDSCAPE'S LIABILITY SHALL NOT EXCEED THE ACTUAL PRICE PAID FOR THE LICENSE TO USE THE PROGRAM. BECAUSE SOME STATES/COUNTRIES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

U.S. GOVERNMENT RESTRICTED RIGHTS. The Program and documentation are provided with restricted rights. Use, duplication, or disclosure by the Government is subject to restrictions as set forth in subparagraph (c)(1)(ii) of The Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 or subparagraphs (c)(1) and (2) of the Commercial Computer Software –Restricted Rights at 48 CFR 52.227-19, as applicable. The Contractor/Manufacturer is Mindscape, Inc., 88 Rowland Way, Novato, CA 94945.

# SAVE THIS LICENSE FOR FUTURE REFERENCE

2999999-301001/R047hc

APPENDIX B

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
## BILL OF COSTS

National Geographic ~~Appellant~~

U.S. COURT OF APPEALS
RECEIVED
CLERK   Appellant
JUL 15 2008
ATLANTA, GA.

vs.

Appeal No. 05-16964 - JJ

Jerry Greenberg Appellee

Fed.R.App.P. 39 and 11th Cir. R. 39-1 (see reverse) govern costs which are taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

### INSTRUCTIONS

In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| DOCUMENT | Repro. Method (Mark One) In-House | Comm* | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| Appellant's Brief (Panel) | .10 | | 68 | 20 | 1360 | 136.00 | $136.00 |
| Record Excerpts (Panel) | .10 | | 169 | 20 | 3380 | 338.00 | $338.00 |
| Appellee's Brief | | | | | | | |
| Reply Brief (Panel) | .10 | | 33 | 20 | 660 | 66.00 | $ 66.00 |
| Appellants' En Banc Brief | .10 | | 65 | 23 | 1495 | 149.50 | $149.50 |
| Appellants En Banc Reply | .10 | | 33 | 23 | 759 | 75.90 | $ 75.90 |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | | TOTAL | $ 765.40 | $ $839.60 |
| | | | | | | REQUESTED | ALLOWED |

* see additional sheet for final total including binding costs. 74.20 + 765.40 = 839.60

I hereby swear or affirm that the costs claimed were actually and necessarily incurred or performed in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Date Signed: 7/11/08

Signature: [signature]

Attorney for: National Geographic
(Type or print name of client)

Attorney Name: Elizabeth M. Locke
(Type or print your name)

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: [signature]
Deputy Clerk
Atlanta, Georgia

---

### FOR COURT USE ONLY

Costs are hereby taxed in the amount of $ __$839.60__ against __Appellee__

and are payable directly to __Appellant__

Issued on: __SEP 0 5 2008__

Thomas K. Kahn, Clerk

By: _____
Deputy Clerk

MISC-12
(12/07)